UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

THE ONEIDA INDIAN NATION OF NEW YORK,
THE ONEIDA TRIBE OF INDIANS OF WISCONSIN,
and THE ONEIDA OF THE THAMES,

                  Plaintiffs,

    and
                                            5:74-CV-187
                                            (LEK/DRH)

THE UNITED STATES OF AMERICA, and
THE NEW YORK BROTHERTOWN INDIAN NATION,

                  Plaintiffs-Intervenors,

    -against-

THE STATE OF NEW YORK, THE COUNTY OF
MADISON, NEW YORK, and THE COUNTY OF
ONEIDA, NEW YORK,

                  Defendants.

---

## MEMORANDUM-DECISION AND ORDER

      This action is brought by three Oneida tribal groups - the Oneida Indian Nation of New York

("New York Oneidas"), the Oneida Tribe of Indians of Wisconsin, and the Oneida of the Thames

(collectively, the "Oneidas" or "Plaintiffs").  Plaintiffs seek redress for allegedly unlawful transfers

of approximately 250,000 acres of land in central New York.  The United States intervened as a

plaintiff in this action in March, 1998.  Presently before the Court is a Motion for summary

judgment submitted on behalf of defendants, the State of New York (the "State") and the Counties

of Oneida and Madison (the "Counties") (collectively, "Defendants").  See Defts' Motion for

Summary Judgment (Dkt. No. 582).

I.      **Historical Background**

At the time of the American Revolution, the Oneida Indian Nation, of which Plaintiffs are direct descendants, was one of the six nations of the Iroquois, or Haudenosaunee, Confederation, which was then the most powerful Indian tribe in the Northeast. County of Oneida v. Oneida Indian Nation of N.Y., 470 U.S. 226, 230 (1985) ("Oneida II").  The Oneidas actively aided the colonists during the Revolution, even while most of the Iroquois sided with the British. Id. at 231.  In recognition of this vital aid, the United States guaranteed certain lands to the Oneidas. Id.  The 1794 Treaty of Canandaigua was one of a series of treaties in which "the National Government promised that the Oneidas would be secure in the possession of the lands on which they settled." Id.

In 1788, the Oneidas ceded most of their six (6) million acre homeland to the State, reserving only 300,000 acres for themselves.  Joseph Singer, Nine-Tenths of the Law: Title Possession & Sacred Obligation, 38 Conn. L. Rev. 605, 612 (2006).  Commentators note that while the Oneidas made the decision to proceed with the transfer of their aboriginal lands, they likely did so under great duress. Id.  The Oneidas bring this action to vindicate their tribal rights in approximately 250,000 acres of land located generally in the Counties; this land comprises a small fraction of their original lands and was specifically guaranteed to the Oneidas "use and cultivation" by the Treaty of Canandaigua. See id; Amended Complaint (Dkt. No. 582 , Attach. 6, Ex. A) at ¶ 1; Plntfs' Stat. of Mat. Facts (Dkt. No. 599, Attach. 2) at ¶ 1.

Plaintiffs allege that the claimed land was wrongfully acquired or transferred from them by the State through a series of transactions in violation of the Indian Trade and Intercourse Act, codified as 25 U.S.C. § 177 (the "Nonintercourse Act"), the Treaty of Canandaigua, and federal

common law.  Id.  This action and other related Indian land claims have a long and tortured

procedural history; familiarity with the history and the detailed factual record in this case is

presumed.[1]

Plaintiffs are the heirs and political successors to the aboriginal Oneida Indian Nation that

occupied the claimed land from time immemorial.  Id. at ¶ 11.  Plaintiffs are also the heirs to a long

and proud history; a history that is filled with a number of betrayals.  As part of that history,

Plaintiffs inherited the legal claim to right the historic wrongs born of actions that can only be seen

as grave injustices.  The courts have held themselves open to Plaintiffs' land claims for generations,

however, recent legal developments raise the possibility that this Court might be compelled to close

its doors now.  The Court does not believe that the higher courts intended to or have barred

Plaintiffs from receiving any relief; to do so would deny the Oneidas the right to seek redress for

long-suffered wrongs.  For the reasons discussed below, the Court grants Defendants' Motion for

summary judgment in part and denies the Motion in part.


## II.      Background Related to Present Motion

Defendants argue that recent decisions by the United States Supreme Court and the Court of

Appeals for the Second Circuit mandate dismissal of the claims asserted by the Oneidas (and the

United States on their behalf) in the instant case.  Defts' Mem. of Law (Dkt. No. 582, Attach. 3) at

2-3.  In March, 2005, the Supreme Court issued its decision in City of Sherrill v. Oneida Indian

Nation of New York, 544 U.S. 197 (2005).  In Sherrill, the Supreme Court held that equitable

---

[1] The factual history of this action is described in detail in Oneida Indian Nation of New
York v. New York, 194 F. Supp. 2d 104 (N.D.N.Y. 2002) ("Oneida 2002") (Kahn, D.J.).

principles barred the New York Oneidas from reasserting tribal sovereignty over land they had purchased that was within the boundaries of the Oneidas' former reservation area.  Id.  Following the Sherrill decision, the Second Circuit held in Cayuga Indian Nation of New York v. Pataki, 413 F.3d 266 (2d Cir. 2005), cert. denied, 126 S. Ct. 2021, 2022 (2006), that disruptive possessory land claims are subject to the equitable doctrines, specifically laches, applied in Sherrill.  Id. at 275.  Defendants assert that the heart of Plaintiffs' case is the claim that they have a current possessory interest in the claim area that dates back to time immemorial, which was recognized by the United States in the 1794 Treaty of Canandaigua, and that has never been extinguished.  Defts' Mem. of Law (Dkt. No. 582, Attach. 3) at 16.  Accordingly, Defendants suggest that Plaintiffs' claims are foreclosed by Sherrill and Cayuga and must be dismissed.  Plaintiffs respond that: (1) Defendants have ignored the Oneidas' non-possessory claim to compel the State of New York to pay fair compensation for the Oneidas' land based on its value when the State acquired it; and (2) their trespass damages claims cannot be barred by laches without further discovery of facts related to the delay in bringing the claims and the prejudice that may result from those claims.  Plntfs' Mem. of Law (Dkt. No. 599, Attach. 1) at 1-2.

## III.     Discussion

### A.     Standard of Review

Rule 56 of the *Federal Rules of Civil Procedure* provides that summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett,

477 U.S. 317, 322 (1986).  Courts applying this standard must "resolve all ambiguities, and credit

all factual inferences that could rationally be drawn, in favor of the party opposing summary

judgment." Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001) (quoting Cifra v. Gen. Elec.

Co., 252 F.3d 205, 216 (2d Cir. 2001)).

Once the moving party meets its initial burden by demonstrating that no material fact exists

for trial, the nonmovant "must do more than simply show that there is some metaphysical doubt as

to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)

(citations omitted).  The nonmovant "must come forth with evidence sufficient to allow a reasonable

jury to find in her favor." Brown, 257 F.3d at 251 (citation omitted).  Bald assertions or conjecture

unsupported by evidence are insufficient to overcome a motion for summary judgment. Carey v.

Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991); W. World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121

(2d Cir. 1990).


### B.    Laches Bar Plaintiffs' Possessory Land Claims

#### 1.    Reconsideration of Defendants' Laches Defense

Defendants assert that the Cayuga decision, which dismissed land claims brought by the

Cayuga Nation, means that the Second Circuit has already determined that the very claims at issue

in this case are barred by laches.  Defts' Mem. of Law (Dkt. No. 582, Attach. 3) at 19.  Relying on

Supreme Court and Second Circuit precedent, this Court struck Defendants' laches defense in its

March, 2002 Memorandum-Decision and Order.  Oneida 2002, 194 F. Supp. 2d at 124.  In their

Memorandum of Law, Defendants urge the Court to reconsider its prior decision regarding the

laches defense.  Defts' Mem. of Law (Dkt. No. 582, Attach. 3) at 7.  As discussed below, in light of

the Cayuga and Sherrill decisions, the Court now holds that Defendants can assert a laches defense

against Plaintiffs' possessory land claims.

Courts retain the inherent authority to modify or adjust all interlocutory orders prior to the

entry of a final judgment.  Parmar v. Jeetish Imports, Inc., 180 F.3d 401, 402 (2d Cir. 1999) (citing

FED. R. CIV. P. 54(b); United States v. LoRusso, 695 F.2d 45, 53 (2d Cir. 1982)).  Typically, on a

motion by a party, a court may justifiably reconsider its previous ruling when there is an intervening

change in the controlling law.  Delaney v. Selsky, 899 F. Supp. 923, 925 (N.D.N.Y. 1995)

(McAvoy, C.J.) (citing Doe v. New York City Dep't of Soc. Servs., 709 F.2d 782, 789 (2d Cir.

1983)).  However, there must be more that simply "mere doubt" regarding the effect of an apparent

change in the controlling law in order to open a matter for full reconsideration.  See Doe, 709 F.2d

at 790 n.9.

This Court's prior Order reviewed the case law and found that "[c]ourts analyzing Indian

land claim actions have consistently rejected the use of delay-based defenses."  Oneida 2002, 194 F.

Supp. 2d at 123 (citing Oneida Indian Nation of New York v. New York, 691 F.2d 1070, 1084,

1097 (2d Cir. 1982) (rejecting the validity of delay-based defenses, specifically laches, in Indian

land claim action)).  In Cayuga, the Second Circuit reasoned, based on the Sherrill decision, that

equitable defenses, including laches, can be applied to viable possessory land claims that were filed

within the applicable statute of limitation.  See Cayuga, 413 F.3d at 273-74.  Furthermore, the

Second Circuit explicitly stated, "if the Cayugas filed this complaint today, exactly as worded, a

District Court would be required to find the claim subject to the defense of laches under Sherrill and

could dismiss on that basis," id. at 278, and conceded that, "Sherrill effectively overruled [the

Second Circuit's] holding in <u>Oneida Indian Nation v. New York</u> . . . that laches and other time-bar

defenses should be unavailable. . . " <u>Id.</u> at 277 n.6.  The Second Circuit has now recognized that the

precedents relied on by this Court's prior ruling have been overruled; therefore, there can be no

question that the controlling law has been effectively transformed and that the Court's prior order

should be reconsidered.

### 2.   Plaintiffs Assert Possessory Land Claims Subject to Laches Defense

The Second Circuit determined that the Cayugas' claim had always been one "sounding in

ejectment." <u>Id.</u> at 274.  The Circuit reasoned that though the district court only awarded money

damages, the Cayugas had "asserted a continuing right to immediate possession as the basis of all of

their claims, and have always sought ejectment of the current landowners as their preferred form of

relief." <u>Id.</u>  The Second Circuit concluded that this type of claim is inherently disruptive because it

seeks to overturn years of settled land ownership. <u>Id.</u> at 275.  Therefore, as discussed above, the

Circuit held that the type of claim advanced by the Cayugas is subject to equitable defenses,

including laches. <u>Id.</u>

In their Amended Complaint, Plaintiffs assert a current possessory interest in the land and

seek equitable relief restoring possession to them of the land held by Defendants.  For example,

Plaintiffs' Amended Complaint alleges, *inter alia*, that they were "unlawfully dispossessed of the

subject lands, and that unlawful dispossession of the subject lands continues to the present day."

Amended Complaint (Dkt. No. 582 , Attach. 6, Ex. A) at ¶ 49.  Moreover, Plaintiffs claim that

"[u]nder the Nonintercouse Act, 25 U.S.C. § 177, Plaintiff Tribes have a continuing right to title to

and possession of the subject lands, absent a transfer of the subject lands in compliance with that

Act." <u>Id.</u> at ¶ 58.  In connection with these claims, Plaintiffs seek relief, including, but not limited

to: (1) a declaration that they have possessory rights to the claimed lands and that Defendants' interests in the lands are null and void; (2) injunctive relief as necessary to restore possession of the claimed lands to which Defendants claim title; (3) damages in the amount of the fair market value of the subject lands, as improved; and (4) trespass damages.  See id. at 24-25.  Like the claims before the Second Circuit in Cayuga, Plaintiffs assert certain claims predicated on their continuing right to possess land in the claim area and seek relief returning that land and damages based on their dispossession.  The Second Circuit has held that a laches defense does apply to "indisputably disruptive" possessory land claims, like those brought by the Cayugas and Plaintiffs in the instant case, when plaintiffs seek possession of large swaths of land and the possible ejectment of current landowners.  See Cayuga, 413 F.3d at 275. Accordingly, pursuant to the Cayuga decision, the Court is now required to find Plaintiffs' possessory land claims are subject to the defense of laches.

### 3.    Application of Laches Defense

The Cayuga court has adopted a specific set of criteria, originally articulated in Sherrill, to determine when laches should bar possessory Indian land claims, such as those before the Court.  See Cayuga, 413 F.3d at 277.  The Second Circuit concluded that the same considerations that "doomed the Oneidas' claim in Sherrill" required the dismissal of the Cayugas' land claims; these considerations were:

> [G]enerations have passed during which non-Indians have owned and developed the area that once composed the Tribe's historic reservation; at least since the middle years of the 19th century, most of the [Tribe] have resided elsewhere; the longstanding, distinctly non-Indian character of the area and its inhabitants; the distance from 1805 to the present day; the [Tribe's] long delay in seeking equitable relief against New York or its local units; and developments in [the area] spanning several generations.

Id. (internal citations and quotations omitted).  As discussed below, in light of the factors

8

established by the Second Circuit, the Court concludes that the factual record developed in this case and the Supreme Court's findings in Sherrill warrant dismissal of Plaintiffs' possessory land claims to the land held by Defendants.  The generally self-evident findings below apply with equal force to land held by Defendants, as well as to land held by private parties.

The transactions at issue before the Court are of particularly ancient pedigree; however, Plaintiffs did not seek redress until relatively recently.  In Sherrill, the Supreme Court reviewed the historical record of the State's purchases of reservation land from the Oneidas - purchases which are the subject of the instant action.  See Sherrill, 544 U.S. at 204-05.  The Supreme Court noted that even after the 1794 Treaty of Canandaigua acknowledged the Oneida Reservation and guaranteed the Oneidas' free use and enjoyment of their territory, the State continued to purchase reservation land over the objections of President Washington's administration.  Id. at 205.  For example, in 1795, without federal supervision, the State negotiated to buy 100,000 acres of the 300,000 acres that comprised the Oneidas' Reservation; by 1843, the New York Oneidas retained less than 1,000 acres in the State.  Id. at 205-07.  Accordingly, it stands to reason that most of the transactions at issue are now over 150 years old.  The Oneidas acknowledge that the last transaction that they or individual Oneidas entered into with the State took place in 1846.  Plntfs' Stat. of Mat. Facts (Dkt. No. 599, Attach. 2) at ¶ 2.  The Sherrill decision concluded that the same transactions now before this Court "occurred in the early years of the Republic . . . [, yet] [t]he Oneidas did not seek to regain possession of their aboriginal lands by court degree until the 1970's."  Id. at 217.  The Supreme Court held that, combined with other factors, "this long lapse of time" precluded the Oneidas from gaining the disruptive remedy they sought.  Id.  Plaintiffs did not first file their Complaint with this Court until 1974, nearly 130 years after the last transaction subject to suit.  See

Complaint (Dkt. No. 1).  Consequently, this Court is bound by the Supreme Court's findings that, for purposes of applying laches to land claims, there was a significant lapse of time between the complained of land transactions and Plaintiffs' efforts to regain possession of the claimed land.

Most of the Oneidas have lived elsewhere since the mid-nineteenth century and the land in the claim area has a distinctly non-Indian character.  Id. at 202.  In spite of its commitments under the Treaty of Canandaigua, the United States and its agents "pursued a policy designed to open reservation land to white settlers and to remove tribes westward."  Id. at 205.  As a result, Federal agents actively encouraged the Oneidas to move west.  Id. at 206.  Accordingly, by 1825, nearly 150 Oneidas had moved to Wisconsin; 600 Oneidas resided in Wisconsin by 1838, while 620 remained in New York.  Id.  Finally, as the Supreme Court recognized, by the mid-1840's only 200 Oneidas remained in the State.  Id. at 207.  Furthermore, Plaintiffs also admit that the population of the claim area has been predominately non-Indian since the mid-nineteenth century.  Plntfs' Stat. of Mat. Facts (Dkt. No. 599, Attach. 2) at ¶ 9.

At the same time, the historical record reflects an explosion of the white settler population in the area that is now Oneida and Madison Counties.  In 1790, one settler town with a population of 1,891 abutted the Oneida reservation.  Taylor Report (Dkt. No. 582, Attach. 9, Ex. J) at 143.  By the next census in 1800, there were eighteen settler towns around the Oneida Reservation with a population of 28,815; the settler population reached 55,778 in 1810.  Id.  In 1890, Madison County had a population of 42,892 and Oneida County's population was 122,922.  1890 Census (Dkt. No. 582, Attach. 12, Ex. W) at Table 4.  By 2005, 235,469 people lived in Oneida County, and only 0.2% of that population was recorded in the census as American Indian and Alaska Native persons, a percentage that would presumably include any Oneidas presently living in the county.  See U.S.

10

Census Bureau, Oneida County, New York website *at* http://quickfacts.census.gov/
qfd/states/36/36065.html (last visited Apr. 25, 2007).  Madison County had a population of 70,337
in 2005, of which 0.6% was recorded as American Indian and Alaska Native persons.  See U.S.
Census Bureau, Madison County, New York  website *at* http://quickfacts.census.gov/qfd/states/
36/36053.html (last visited Apr. 25, 2007).  Accordingly, the Court finds that there can be no
dispute that since the nineteenth century the population of Madison and Oneida Counties has been
fundamentally transformed and is now comprised primarily of non-Oneida peoples.  See, e.g.,
Sherrill, 544 U.S. at 220 (" . . . Oneida County [is] today overwhelmingly populated by non-
Indians.").

      Non-Indians have greatly developed the area in question and have justified expectations that
they will continue to maintain their lives there.  The Supreme Court has explicitly stated "that
[g]enerations have passed during which non-Indians have owned and developed the area that once
composed the [Oneidas'] historic reservation."  Id. at 202.  As part of its holding denying the
Oneidas' sovereignty over land within the City of Sherrill, the Supreme Court recognized and relied
on the "dramatic changes in the character of the properties" located within the claim area at issue
before the Court.  Id. at 216-17.  While asserting that Oneidas did continue to live in the area,
Plaintiffs themselves admit that non-Indians occupied and developed the land.  Plntfs' Stat. of Mat.
Facts (Dkt. No. 599, Attach. 2) at ¶ 4.  Moreover, in a prior Order in this case, the Court found that
Plaintiffs could not amend their complaint to include 20,000 private landowners because of the
impossibility of restoring to the Oneidas lands that non-Oneida peoples have subjected to
"development of every type imaginable . . . for more than two centuries."  Oneida Indian Nation of
New York v. County of Oneida, 199 F.R.D. 61, 92 (N.D.N.Y. 2000) (McCurn, Senior D.J.).  The

same self-evident observation can be made in connection with Defendants' lands before the Court in the instant Motion. <u>See</u> <u>id.</u>

The Second Circuit was very clear in <u>Cayuga</u>: Indian possessory land claims that seek or sound in ejectment of the current owners are indisputably disruptive and would, by their very nature, project redress into the present and future; such claims are subject to the doctrine of laches. <u>Cayuga</u>, 413 F.3d at 275. Furthermore, the Second Circuit dismissed the Cayugas' claims in substantial part because the same considerations that doomed the Oneidas' claim in <u>Sherrill</u> applied with equal force to the Cayugas' claims. <u>See</u> <u>id.</u> at 277. The claims before this Court arise from nearly identical circumstances and the Court is obligated to follow the same reasoning.

Plaintiffs argue that a laches inquiry is fact-intensive and that the Court cannot determine whether laches bars Plaintiffs' claims without permitting additional discovery and holding an additional evidentiary hearing. Plntfs' Mem. of Law (Dkt. No. 599, Attach. 1) at 13-15. Some could read the <u>Cayuga</u> decision to require an evidentiary hearing regarding a laches defense because it states that it is "affirm[ing] the District Court's finding that the possessory land claim is barred by laches." <u>Cayuga</u>, 413 F.3d at 277. However, the Second Circuit prefaced its "affirmance" by noting that "the considerations identified by the Supreme Court in <u>Sherrill</u> mandate[d]" such an action. <u>Id.</u> This Court understands this language to mean that even in the absence of a finding by the district court that laches barred the claims, the Second Circuit would have held that the <u>Sherrill</u> factors controlled and that the Cayugas' claims were barred by laches. Therefore, as discussed above, the Court finds additional discovery unnecessary,[2] and that the undisputed facts as developed by the

---

[2] It is also important to note that the facts that would be considered as part of a laches inquiry, especially with regard to the potential prejudice that would result to Defendants, are generally self-evident and further discovery regarding these matters would, in any event, be

parties and in Second Circuit and Supreme Court precedent require the Court to grant Defendants'

Motion for summary judgment and dismiss Plaintiffs' possessory land claims.

     The Court is compelled to take this action to prevent further disruption: Plaintiffs seek to

eject Defendants from their land and obtain trespass damages related to Defendants' unjust

possession of the land.  Under the factors to be considered in a laches analysis, as set forth in

Cayuga, it is not necessary to determine whether Plaintiffs unreasonably delayed in pursuing their

claims.  In fact, the Oneidas have diligently pursued their claims in various fora, and this finding

does not, in any substantial part, rest on any supposed deficiency in the Oneidas' efforts to vindicate

their claims.[3]  However, claims based on the Oneidas' possessory rights are disruptive to

---

counterproductive.  This Court takes special notice of Judge McCurn's wise reasoning, born of long
experience with various Indian land claim litigations, that led him to conclude the following about
the efficacy of ordering such an evidentiary hearing:

> It is true that for a time in Cayuga, this court did entertain the possibility of ejectment as a
> remedy.  Exercising an abundance of caution in this relatively nascent area of federal Indian
> law, (*i.e.* the appropriate remedies for land claims), the court in Cayuga did conduct an
> evidentiary hearing on the issue of the availability of ejectment as a remedy.  Like a Monday
> morning quarterback with the advantage of hindsight, however, the court is now convinced
> that hearing can fairly be described as an academic exercise.  Much of the proof adduced
> therein fell into the category of commonsense observations as to the relative pros and cons of
> ejectment.  Many of the reasons which this court gave in Cayuga Indian Nation of New York
> v. Cuomo, 80-CV-930, 80-CV-960, 1999 WL 509442 (N.D.N.Y. July 1, 1999) (McCurn,
> Senior D.J.) for not permitting ejectment, such as the potential for displacement of vast
> numbers of private landowners; "negative economic impact [;]" "widespread disruption" to
> everyone residing in the general vicinity of the claim area due, in part, to interference with
> transportation systems which currently transect the claim area, were self-evident. See id. at
> *22 and *29. The court gained little if any insight--either factually or legally--from that
> hearing; it only needlessly prolonged the Cayuga litigation.

Oneida Indian Nation of New York, 199 F.R.D. at 92.

   [3] See generally, Joseph Singer, Nine-Tenths of the Law: Title Possession & Sacred
Obligation, 38 Conn. L. Rev. at 615-28. (enumerating barriers that Oneidas faced to bringing suit,
including: general lack of jurisdiction to hear claims in federal and state court and finding a private
right of action to vindicate their rights); see also Oneida Indian Nation of New York v. Oneida

13

Defendants' rights and might also call into question the rights of tens of thousands of private landowners and their legitimate reliance interests to continue in the undisturbed use and enjoyment of their property.  Past injustices suffered by the Oneidas cannot be remedied by creating present and future injustices.

### C.  Non-Possessory Claims Survive Summary Judgment

As the Supreme Court recognized in <u>Sherrill</u>, the Oneidas' claims concern "grave, but ancient, wrongs, and the relief available must be commensurate with that historical reality." <u>Sherrill,</u> 544 U.S. at 217 n.11.  Finding that the Oneidas have a current possessory right in the land at issue would create an unduly burdensome disruption to the State and Counties; however, Plaintiffs have alleged other, non-disruptive, claims that are commensurate with the historical record and current property holdings, and allow them the opportunity to vindicate claims that were wrongly denied them.

Plaintiffs assert that their Complaint contains a non-possessory claim against only the State for damages in the amount by which the State underpaid the Oneidas for their land, which the State re-sold for large profits.  Plntfs' Mem. of Law (Dkt. No. 599, Attach. 1) at 4.  According to

---

<u>County</u>, 434 F. Supp 527, 536-37 (N.D.N.Y. 1977) ("<u>Test Case</u>") (Port, Senior D.J.) ("Despite these conditions of poverty and illiteracy, and although their attempts to redress grievances were totally futile, the Oneidas did protest the continuing loss of their tribal land.  These efforts were not documented prior to 1909.  However, expert witnesses testified that between 1840 and 1875 the Oneidas often attempted to petition the federal government.  Usually, such petitioning was conducted through the Oneidas' Indian agent. On one occasion, in 1874, a group of Oneidas travelled from Wisconsin to Albany, New York and consulted with a private law firm.  All of these efforts were to no avail.  Between 1909 and 1965, the Oneidas contacted the federal government innumerable times in connection with land claims and other grievances.").

Plaintiffs, their fair compensation claim is not disruptive and, therefore, is not subject to a laches defense. Id. at 5. Plaintiffs state that a fair compensation claim is based on the premise that titles cannot be challenged. Id. at 6. Plaintiffs explain this claim recognizes that when a defendant has obtained a plaintiff's land in violation of law but the passage of time and changed circumstances bar its restoration, equity assures the plaintiff at least that he will have fair compensation for his lands, usually the defendants' profit on re-sale. Id. Accordingly, a fair compensation claim recognizes that equity bars the return of land and assures fair compensation for the sale of that land; therefore, fair compensations damages accept the finality of the land conveyances and, instead of rescission, retrospectively make the transaction fair. Id.

### 1.   **Sherrill and Cayuga Only Bar Disruptive Possessory Claims**

As explained above, the Second Circuit, relying on the reasoning in Sherrill, dismissed the Cayugas' possessory land claims because they were disruptive, forward-looking claims subject to laches and other equitable defenses. Cayuga, 413 F.3d at 277. The Circuit also barred the Cayugas' request for trespass damages in the amount of the fair rental value of the land for the entire period of dispossession. Id. at 278. The Circuit explained that trespass damages were also "predicated entirely upon plaintiffs' possessory land claim, for the simple reason that there can be no trespass unless the Cayugas possessed the land in question." As a result, the Circuit reasoned that the Cayugas' request for trespass damages depended on their disruptive, possessory land claim and was also barred by laches. Id. Accordingly, a claim not predicated on Plaintiffs' possession of the disputed land would not be subject to the equitable defense of laches. This outcome is consistent with precedent: Plaintiffs are pursuing this action at law and the application of laches in such an action "would be novel indeed." Oneida II, 470 U.S. at 245 n.16.

### 2.   Plaintiffs Assert Non-Possessory Common Law Claims

In <u>Sherrill</u>, the Supreme Court stated that its decision in <u>Oneida II</u> recognized that the Oneidas could maintain a federal common-law claim for damages for ancient wrongdoing in which both national and state governments were complicit.  <u>Sherrill</u>, 544 U.S. at 202.  The <u>Sherrill</u> decision explicitly held that "the question of damages for the Tribe's ancient dispossession is not at issue in this case, and we therefore do not disturb our holding in <u>Oneida II</u>."  <u>Id.</u> at 221.  In <u>Oneida II</u>, the Supreme Court held that the Nonintercourse Act does not speak to the question of remedies, and, therefore, the Oneidas are not preempted from bringing federal common-law actions to enforce their rights.  <u>See Oneida II</u>, 470 U.S. at 237-40.  Therefore, subject to the requirements laid out by the Second Circuit in <u>Cayuga</u>, Plaintiffs may bring common law claims against Defendants to remedy past violations of their legal rights.[4]

---

[4] Additionally, the Second Circuit has previously held that the Oneidas can maintain a private right of action to enforce the Nonintercourse Act and may seek damages for violations of the act.  <u>Oneida Indian Nation v. County of Oneida</u>, 719 F.2d 525, 537-41 (2d Cir. 1983).  The Supreme Court did not reach the question or determine if there was an implied statutory cause of action under the Nonintercourse Act when it reviewed the Circuit's decision in <u>Oneida II</u>.  <u>Oneida II</u>, 470 U.S. at 233.  Accordingly, a claim predicated on a violation of the Nonintercourse Act and seeking remedies effectuating the intent of the act might also be appropriate.  However, Defendants correctly note that the Circuit recognized an implied right of action that was possessory in nature.  <u>See</u> Defts' Reply Mem. of Law (Dkt. No. 606, Attach. 1) at 7 n.9.  The Circuit noted that the Oneidas' right of action "closely corresponds to the common law action for ejectment in which a plaintiff need only establish his right to possession."  <u>Oneida Indian Nation</u>, 719 F.2d at 540.  The implied right of action found by the Circuit was based on ejectment and would likely be subject to the same laches analysis discussed in Section III.B, <i>supra</i>.  There is no precedent that forecloses Plaintiff from asserting a right of action under the Nonintercourse Act.  However, in light of <u>Sherrill</u> and <u>Cayuga</u>, Plaintiffs' common law claims are on stronger ground.  In any event, an analysis of Plaintiffs' common law claims would be part of the determination of a remedy that would be commensurate with vindicating any violations of the Nonintercourse Act.  Therefore, the Court will limit its discussion to Plaintiffs' common law claims.

###### i.        Plaintiffs Adequately Pled Non-Possessory Claims

In their Amended Complaint, Plaintiffs do allege facts necessary to assert non-possessory claims against the State.  The only burden that a plaintiff must meet at the pleading stage is that found in Rule 8(a) of the *Federal Rules of Civil Procedure*, which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Amron v. Morgan Stanley Inv. Advisors, Inc. 464 F.3d 338, 343 (2d Cir. 2006) (citing Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002)).  In order to meet this burden, a complaint need only "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which its rests."  Amron, 464 F.3d at 343 (internal quotations omitted).  This standard also requires a plaintiff to allege those facts sufficient to establish liability.  See id. at 344 (citing Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 346-47 (2005)).

Plaintiffs correctly note that their Amended Complaint alleges that the State provided the Oneida Indian Nation with inadequate compensation for certain land transfers.  See Plntfs' Mem. of Law (Dkt. No. 599, Attach. 1) at 4.  Paragraph 31 of the Amended Complaint alleges facts sufficient to establish the State's liability based on an agreement the State entered into with the Oneida Indian Nation on September 15, 1795 to purchase approximately 100,000 acres of land; the Amended Complaint asserts that the State paid approximately fifty (50) cents per acre for the land, but obtained seven (7) times that amount when it resold the land to white settlers over a two-year period.  Amended Complaint (Dkt. No. 582 , Attach. 6, Ex. A) at ¶ 31.  Moreover, Paragraph 35 alleges that after each of the twenty-six (26) agreements at issue, "the State made substantial profits on its purported sales of the subject lands."  Id. at ¶ 35.  The Amended Complaint seeks relief based on the benefit the State received from the land sales in the form of "disgorgement" of the

"difference in value between the price at which New York State acquired or transferred each portion of the subject lands from the Oneida Indian Nation and its value." Id. at 26 ¶ 6. Under the liberal standard set forth in Rule 8, Plaintiffs have provided the State with adequate notice of their challenge to the consideration the Oneida Indian Nation received for the land transferred to the State pursuant to the twenty-six (26) agreements at issue in this action.

### ii.   Plaintiffs' Non-Possessory Claims Are Consistent with Cayuga and Federal Common Law

In addition to providing the State fair notice, Plaintiffs must also have alleged a cause of action consistent with federal common law in light of the Cayuga decision. The Second Circuit has made clear that Indian claims seeking damages for the loss of use and possession of land are as disruptive as ejectment claims would be, and, therefore, are subject to laches. See Cayuga, 413 F.3d at 275-78. In the instant matter, Plaintiffs claim that the State inadequately compensated the Oneida Indian Nation for land transferred to it. This claim is best styled as a contract claim that seeks to reform or revise a contract that is void for unconscionability. This type of contract claim is not disruptive. As explained below, this type of claim only seeks retrospective relief in the form of damages, is not based on Plaintiffs' continuing possessory right to the claimed land, and does not void the agreements. As a result, the Court would reform the agreements through an exercise of its equitable power, which implicitly recognizes and confirms the transfer of property made pursuant to the agreements subject to attack. Therefore, Plaintiffs may pursue this cause of action while conforming to the Circuit's mandate in Cayuga that Defendants' settled expectations not be disrupted.

### iii.      Federal Common Law Precedent

Cayuga did not foreclose Plaintiffs from bringing non-disruptive federal common law claims against the State.  The history of federal regulation of relations with the Indian tribes and the unique federal policy concerns related to Indian land claims makes it unnecessary to adopt state law as the federal rule of decision in this case.  See United States v. Kimbell Foods, Inc., 440 U.S. 715, 728 (1979); Oneida II, 470 U.S. at 235-41.  Additionally, federal courts have examined Indian claims and developed a body of law for situations that are nearly identical to the contract claims presented by Plaintiffs.  In those cases, tribal claimants sought additional compensation for land ceded to the United States by treaty for which they received unconscionable consideration, which is similar to Plaintiffs' fair compensation claim against the State.  As explained below, a quasi-adjudicatory body and the Court of Claims developed rules that preserved the land transactions, but revised the challenged treaties to allow the tribal claimants to seek damages so that they would be adequately compensated for their land transfers.

In 1946, Congress enacted the Indian Claims Commission Act (the "ICCA") and created a quasi-judicial body, subject to appellate review by the Court of Claims, to hear and determine all tribal claims against the United States that accrued before August 13, 1946.  Navajo Tribe of Indians v. New Mexico, 809 F.2d 1455, 1460 (10th Cir. 1987).  The Indian Claims Commission (the "Commission") construed the ICCA to limit available relief "to that which is compensable in money"; legislative history attached to congressional bills extending the Commission's mandate confirmed that "[t]ribes with valid claims would be paid in money.  No lands would be returned to a tribe."  Id. at 1461 (internal quotations omitted).  The ICCA granted the Commission jurisdiction over a variety of tribal claims against the United States, including "claims which would result if the

treaties, contracts or agreements between the claimant and the United States were revised on the

ground of fraud, duress, unconscionable consideration, mutual or unilateral mistake, whether of law

or fact, or any other ground cognizable by a court of equity."[5]  ICCA § 2(3), 25 U.S.C. § 70a(3)

(1976) (repealed).  Pursuant to the ICCA, the Commission and the Court of Claims adjudicated

claims seeking to revise contracts with the United States based on a claimant's receipt of

unconscionable consideration in various treaties transferring tribal land to the United States.  See,

e.g., Crow Tribe v. United States, 284 F.2d 361 (Ct. Cl. 1960), cert. denied, 366 U.S. 924 (1961);

Miami Tribe of Oklahoma v. United States, 281 F.2d 202 (Ct. Cl. 1960), cert. denied, 366 U.S. 924

(1961), overruled in part on other grounds by Pawnee Indian Tribe v. United States, 301 F.2d 667

(Ct. Cl.), cert. denied, 370 U.S. 918 (1962).

While claims based on unconscionable consideration were brought pursuant to statutory

right, the Court of Claims fashioned a common law rule based on preexisting precedents to

_____

[5] Section 2 of the ICCA granted jurisdiction to the Commission over claims both normally cognizable at law and over those grounded in considerably broader allegations.  Section 2 stated:

The Commission shall hear and determine the following claims against the United States on behalf of any Indian tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska: (1) claims in law or equity arising under the Constitution, laws, treaties of the United States, and Executive orders of the President; (2) all other claims in law or equity, including those sounding in tort, with respect to which the claimant would have been entitled to sue in a court of the United States if the Unites States was subject to suit; (3) claims which would result if the treaties, contracts, and agreements between the claimant and the United States were revised on the ground of fraud, duress, unconscionable consideration, mutual or unilateral mistake, whether of law or fact, or any other ground cognizable by a court of equity; (4) claims arising from the taking by the United States, whether as the result of a treaty of cession or otherwise, of lands owned or occupied by the claimant without the payment for such lands of compensation agreed to by the claimant; and (5) claims based upon fair and honorable dealings that are not recognized by any existing rule of law or equity. . . .

ICCA § 2; 25 U.S.C. § 70(a) (repealed).

determine when Indian claimants could prevail on related claims.[6]  See Coast Indian Community v. United States, 550 F.2d 639, 653 n.45 (Ct. Cl. 1977).  In Osage Nation of Indians v. United States, 97 F. Supp. 381 (Ct. Cl.), cert. denied, 342 U.S. 896 (1951), the Court of Claims established the rule governing unconscionable consideration claims.  The Osage Nation initiated the case in order to seek additional compensation for nearly 870,000 acres in southeastern Kansas ceded to the United States by treaty on September 29, 1865.  Osage Nation, 97 F. Supp. at 384.

Legal Claim and Standard in Osage Nation: In reaching its decision, the Osage Nation court appears to have relied on an earlier Supreme Court case to fashion an unconscionable consideration standard.  The Osage Nation decision cites Klamath & Moadoc Tribes of Indians v. United States, 296 U.S. 244 (1935), which discusses claims seeking to invalidate contracts based on the inadequacy of consideration.[7]  The Klamath court stated that if Indian plaintiffs had asserted a judicially cognizable claim against the United States for inadequate compensation, a showing of mere inadequacy of consideration would not have been enough to invalidate the contract.  Id. at 255.

---

[6] Moreover, the language of the ICCA supports the proposition that the grounds listed in Section 2, clause 3 were to be based on common law precepts.  Clause 3 specifically lists certain jurisdictional grounds and adds jurisdiction based on "any other ground cognizable by a court of equity," and, thus, implies that the other grounds were assumed to be those recognized by courts of equity.  Additionally, clause 5 grants jurisdiction over "claims based upon fair and honorable dealings that are not recognized by any existing rule of law or equity"; this language means that Congress did delineate between legal/equitable claims recognized by courts and those claims based on moral grounds and expected the courts to adhere to common law rules when jurisdiction existed pursuant to other clauses.  Cf. Confederate Tribes of Colville Reservation v. United States, 964 F.2d 1102, 1112-13 (Fed. Cir. 1992) (judicial inquiry of a "fair and honorable dealings" cause of action, brought pursuant to clause 5, should be undertaken in light of moral basis of the claim and not strictly analyzed in connection with the boundaries of the law).

[7] The Supreme Court ultimately held that the congressional statute authorizing suit did not grant the courts jurisdiction over the type of inadequate compensation claim asserted by plaintiffs. Klamath, 296 U.S. at 255.

21

Instead, to sustain such a claim, plaintiffs would need to show "inadequacy of consideration coupled with lack of business capacity and inferiority of position in respect of the transaction or in relation to that of the other party." Id. at 254.  According to the Supreme Court, the Klamath and Moadoc Tribes could not sustain an inadequate consideration claim because "the findings fail to show that any person acting for the United States deceived or misled plaintiffs as to the value of the land or, indeed, had knowledge of any fact bearing upon its value that was not well known by plaintiffs when they made the settlement and gave the release." Id. at 255.

While relying on Klamath, the Osage Nation decision supports a holding that when the record shows that an agreement resulted in a gross disparity between the fair market value and the price paid for the land transferred, a claim of unconscionable consideration presumptively exists and supports the revision of contract.  Consistent with Klamath, the Osage Nation court did revise the treaty with the Osage on unconscionable consideration grounds because of the very low price paid to the Osage coupled with the finding that agents acting for the United States in the negotiation of the treaty with the Osage had knowledge of facts bearing upon the value of the land that was not known to the Osage.  Osage Nation, 97 F. Supp. at 422.  However, at the same time, the Osage Nation court suggested that when the price paid for the transferred land is exceptionally low, that fact alone is sufficient to find that tribal plaintiffs received unconscionable consideration for their lands.  Id.  The Osage Nation court reasoned, "If these Indians had been more versed in the ways of 'civilization' or had been represented, as were some other tribes, by astute white attorneys, it would have been impossible to seriously suggest that 34 cents an acre was a fair price for this land." Id. Accordingly, this reasoning, though antiquated, suggests that courts may find the consideration offered to tribal plaintiffs so unreasonable that it is unnecessary for plaintiffs to make any additional

22

showing regarding the purchasers' intent or  knowledge of the facts surrounding the transaction.

Determination of Unconscionable Consideration in Osage Nation: In order to determine the fair market value of the lands ceded by the Osage Nation, the Court of Claims listed a number of factors that should be considered: the prices at which the land sold, the extent of the demand, the quality of the land and its use at the time, the price paid by the Government for similar land at about the same time under treaties with other Indians, and the prices paid by persons other than Indians buying similar land in the locality from private citizens.  Id. at 403.  As part of its inquiry into these factors, the Court of Claims undertook a detailed review of the congressional acts and debates authorizing the purchase and sales of the Osage territory.  Id. at 403-19.

The Osage Nation court found that the record indicated a vigorous demand for the Osage Nation's land, much of which was sold even before the Osages' title was extinguished.  Id. at 420. Moreover, the Court of Claims found that the congressional debates indicated that the price set for the Government's resale of the land, $1.25 per acre, did not represent the market value of the lands, and that all considered it to be worth much more.  Id.  Instead, the Court of Claims stated that the Government resale price was low because "the real purpose of the Resolution seems to have been to give the Kansas settlers a bargain both in price and in the terms of payment."  Id.  Moreover, the Osage Nation court found that the Government price was exceptionally low because by 1863, when the treaty with the Osage was negotiated, the Government had granted half the land in question to the State of Kansas for railroad purposes - which greatly increased the demand and the value of the land.  Id. at 420-21.  Therefore, the Court of Claims found that when the United States paid the Osage Nation thirty-four (34) cents per acre for the land, the fair market value was significantly higher: Government sales were uniformly at $1.25 per acre, which was a price intentionally set to

benefit white settlers, and the railroads, which also sold the land in question, sold parcels of the land in question for an average of $6.00 per acre.  Id.  The Court of Claims concluded that the Osage Nation was entitled to damages representing the fair value of the land as determined on the treaty date, less the amount already received and any expenses incurred by the Government.  Id. at 422.

Additional Unconscionable Consideration Guidance: The Court of Claims further clarified what amount of consideration might be considered unconscionable.  In Miami Tribe, the court reviewed the Commission's determination that the Miami Tribe did not receive unconscionable consideration for land ceded to Kansas in 1854.  Miami Tribe, 281 F.2d at 206.  The Government and the Miami Tribe introduced evidence related to the cost of similar tracts of land at the time of the cession; based on a review of this evidence, the Court of Claims affirmed the Commission's valuation of the land in question.  Id. at 206-08.  However, the Court of Claims found that the Miami Tribe received a smaller payment for the land than the Commission had originally determined.  Id. at 208.  As a result, the Miami Tribe court reversed the Commission and held that the claimant was paid unconscionable consideration when they received $121,974.23 for land that the Commission found to be worth $317,697.93.  Id.  The Court of Claims explained that the consideration received by the Miami Tribe was:

> only 38% of the value of the land.  It is true that there is no exact dividing line between what is unconscionable and what is not.  The disparity between the price paid and the fair market value of the land must be very great.  We think that the Commission was correct when it said in this case that payment of less than half the true value is unconscionable.

Id. at 208-09.  Accordingly, in certain situations, consideration received by tribal claimants found to worth less than half of the market price for similarly situated land has been deemed unconscionable.

In Crow Tribe, the Court of Claims affirmed the Commission's finding that the Crow Tribe

received unconscionable consideration when it received less than $0.054 per acre, when market value was $0.40 per acre, for approximately 30 million acres ceded to the United States in south central Montana and north central Wyoming.  Crow Tribe, 284 F.2d at 362.  The Court of Claims determined that it did not have to find that the Crow Tribe was induced under mistaken facts to accept inadequate compensation under the unconscionable consideration standard.  See id. at 371.  Accordingly, the Court of Claims held that the Crows received $1,111,768.07 for their land, but were entitled to receive $12,212,305.00; therefore, the court found damages for the Crows in the amount of $10,242,984.70, which was the difference between the two amounts minus additional offsets.  Id. at 373.

        After reviewing the unconscionable consideration cases, this Court finds that Plaintiffs' and the United States' claim for fair compensation and to revise and reform the agreements with the State is consistent with federal law.  In order to prevail on such a claim, Plaintiffs must show either: (1) the  inadequacy of consideration they received coupled with evidence of the inferiority of the Oneida Indian Nation's negotiating position, which can be established by evidence demonstrating that the State deceived or misled Plaintiffs as to the value of the land or had knowledge of any fact bearing upon its value that was not well known by Plaintiffs; or (2) in light of the precedent above and elsewhere, the gross inadequacy of the consideration received by Plaintiffs in comparison to the fair market value of the land such that it is unnecessary for Plaintiffs to make any additional showing regarding the State's actions or  knowledge.  The Court will consider several factors when determining the fair market value of the land, which is critical to any finding regarding the inadequacy of the consideration; these are: the prices at which the land sold, the extent of the demand, the quality of the land and its use at the time, the price paid by the Government for similar

land at about the same time under treaties with other Indians, and the prices paid by persons other than Indians buying similar land in the locality from private citizens.  If Plaintiffs can establish their fair compensation claim for the challenged transactions, they are entitled to damages in the amount of the difference between the fair market value of the land at the time and the consideration received by the Oneida Indian Nation minus any offsets, including, but not limited to, sales costs incurred by the State.[8]

### iv.        Plaintiffs' Factual Allegations

Plaintiffs have presented to the Court evidence in connection with their non-possessory claim that is sufficient to allow a reasonable jury to find in their favor.  See Brown, 257 F.3d at 251. Therefore, Defendants Motion for summary judgment is denied with respect to Plaintiffs' common law fair compensation claim.

In support of their fair compensation claim, Plaintiffs cite previous rulings that the State paid the Oneida Indian Nation "approximately fifty cents per acre" in 1795 to purchase about a third of

---

[8] Plaintiffs and the United States also argue that the common law has long recognized that when equity bars restoration of land to a plaintiff after it has been transferred to innocent third parties, equity also requires a damage award for the difference between the price the defendant paid the plaintiff for the land and its true value when the defendant obtained it.  Plntfs' Mem. of Law (Dkt. No. 599, Attach. 1) at 7-10; United States Mem. of Law (Dkt. No. 601, Attach. 1) at 19-22. Both Plaintiffs and the United States cite ample case law, including cases involving Indian land claims, for this proposition and it may serve as an alternative theory for a damages award. However, the Circuit dismissed the Cayugas' trespass damages claim because it found that the basis for the claim necessitated a finding of constructive possession or Plaintiffs' immediate right of possession; such a finding would be disruptive and barred by laches.  See Cayuga, 413 F.3d at 278. The Circuit's reasoning suggests that any award of damages that is predicated on possession of the land in question, however remotely, is too disruptive and must be barred by laches.  Plaintiffs' and the United States' reliance on the Court's equitable powers to compensate them for the loss of land necessarily implicates the Oneidas' historical claim to the land in question.  In light of the Circuit's reasoning, the Court instead finds that Plaintiffs' and the United States' contract claim does not rely on any present or future claim to the land in question and does not run afoul of the Cayuga court's decision.

the reservation and resold the land "to white settlers for about $3.53 per acre."  Plntfs' Mem. of Law (Dkt. No. 599, Attach. 1) at 11 (quoting Oneida Indian Nation, 719 F.2d at 529).  Additionally, Plaintiffs submitted evidence along with a declaration from James P. Costigan, a real estate appraiser versed in historical land use and valuation records, regarding the valuation of the land transferred pursuant to the agreements at issue.  See Costigan Decl. (Dkt. No. 599, Attach. 3). Plaintiffs' appraiser reviewed county records and records in the State Archives, such as the Surveyor General's Books of Sales of State Lands 1786-1927 and the Comptroller's Ledgers for Bonds and Mortgages held by the State of New York 1796-1916.  Plntfs' Mem. of Law (Dkt. No. 599, Attach. 1) at 11; Costigan Decl. (Dkt. No. 599, Attach. 3) at ¶¶ 8-9.  Plaintiffs attached voluminous exhibits compiling data from these documents to their submission.  See Costigan Decl. (Dkt. No. 599, Attach. 3).

Based on a review of these records, Mr. Costigan asserts that for the 199,000 acres acquired by the State prior to February 11, 1829, the Oneidas were paid $113,213.00 for land the State sold for $626,067.00, a $512,854.00 difference.  Costigan Decl. (Dkt. No. 599, Attach. 3) at ¶ 11. Moreover, Mr. Costigan claims that the State received a range of about three (3) to twelve (12) times more for this land than it paid to the Oneidas.  Id.  In order to determine if the State received all the money due it from these transactions, Mr. Costigan undertook research to confirm that the State was paid in full for all 264 lots in the lands acquired in the 1795 transaction.  Id. at ¶ 12. Plaintiffs' experts have examined ten (10) percent of the State sales in each transaction and believe that the records exists to perform the same verification of payment for all the lots in the land claim area.  Id. at ¶ 14.  For purposes of this Motion, the data submitted by Plaintiffs suggests that there are material facts indicating that the consideration paid to the Oneida Indian Nation by the State was

significantly under the then-fair market price.

Furthermore, consistent with an unconscionable consideration claim, Plaintiffs allege that the State knowingly sought to underpay for the Oneidas' lands.  Plaintiffs point to legislative resolutions and laws appropriating money for purchases from the Oneidas that indicate the State may have intentionally sought to deny the Oneidas' payment of the fair value of the land.  Plntfs' Mem. of Law (Dkt. No. 599, Attach. 1) at 11-12; Smith Aff. (Dkt. No. 599, Attach. 29) at ¶¶ 15-40. The Court finds that Plaintiffs have adequately met their burden and have raised material facts as to the inadequacy of the consideration paid to the Oneida Indian Nation and the State's knowledge with respect to those payments.  Accordingly, Defendants' Motion for summary judgment is denied with respect to Plaintiffs' fair compensation claim against the State.

### D.    Additional Pending Motions

The Court stayed this action pending the final outcomes in the Sherrill and Cayuga cases. See, e.g., Sept. 2005 Order (Dkt. No. 575).  As a result, in addition to the Motion for summary judgment currently before the Court, there are several other pending Motions in this action. However, in light of this Order and the Sherrill and Cayuga decision, three of those Motions can now be disposed.

The United States moves to dismiss the Counties' counterclaims in their Answer to the United States' Second Amended Complaint-in-Intervention.  U.S. Motion to Dismiss Counterclaims (Dkt. No. 445).  The Counties' Answer states three counterclaims against the United States seeking: (1) declaratory relief stating that the reservation guaranteed to the Oneida Nation pursuant to the Treaty of Canandaigua was disestablished; (2) contribution in the event the Counties are found

liable to the Oneidas; and (3) recoupment from the United States for damages owed to the Oneidas. See Counties' Answer (Dkt. No. 410) at ¶¶ 112, 135-36, 142. The United States' Second Amended Complaint-in-Intervention does not assert a cause of action against the Counties. Moreover, as explained above, Plaintiffs' causes of actions against the Counties are all possessory claims and have been dismissed. Therefore, the Counties have been dismissed from the action, and, as a result, their counterclaims are moot. **Accordingly, the United States' Motion to dismiss the Counties' counterclaims is dismissed as moot**.

Plaintiffs, joined by the United States, move to strike the defense that the Nonintercourse Act does not apply to Oneida land in New York because the State allegedly acquired full title to such lands under the 1788 Treaty of Ft. Schuyler. Plntfs' Motion to Strike (Dkt. No. 522). Plaintiffs correctly note that the Court has already struck this defense. See Plntfs' Mem. in Support of Motion to Strike (Dkt. No. 522, Attach. 2) at 2; Oneida 2002, 194 F. Supp at 139-40. In response, Defendants filed a Motion to reconsider the Court's Order striking Defendants' affirmative defense regarding the Treaty of Ft. Schuyler. Defts' Motion to Reconsider (Dkt. No. 546). Defendants' defense asserts that this pre-Constitution treaty effectively ceded and granted all Oneida lands to the State and extinguished the Oneidas' aboriginal title. See Defts' Mem. in Support of Motion to Reconsider (Dkt. No. 546, Attach. 2) at 4. **The Court has now dismissed Plaintiffs' and the United States' possessory land claims; therefore, Defendants' affirmative Ft. Schuyler defense is moot and both Plaintiffs' Motion to strike and Defendants' Motion to reconsider are dismissed as moot.**

29

**IV.     Conclusion**

In Oneida II, the Supreme Court reviewed the history of promises made by the United States to the Oneidas.  Beginning with the Treaty of Ft. Stanwix in 1784, the United States promised the Oneidas would be secure "in possession of the lands on which they are settled"; and in 1789, the United States reaffirmed in the Treaty of Ft. Harmar that the Oneidas were "again secured and confirmed in the possession of their respective lands"; and again in 1794, the Treaty of Canandaigua provided, "[t]he United States acknowledge the lands reserved to the Oneida . . . in their respective treaties with the state of New York, and called their reservations, to be their property; and the United States will never claim the same, nor disturb them . . . in the free use and enjoyment thereof . . . ."  Oneida II, 470 U.S. at 231 n.1.  As explained above, the Second Circuit's Cayuga decision holds that equity bars the Oneidas' attempts to vindicate their rights to the lands promised to them by the United States and the State because of the disruption that would be caused to Defendants' expectations and those innocent third parties who now reside related lands.  However, the equities also mandate that the Court not pass judgment without noting that the Oneidas and their ancestors have been subjected to historic levels of disruption -- disruption that forms the heart of this action and merits this Court's consideration.  This Order permits the Oneidas to reform and revise the twenty-six (26) agreements with the State and to receive fair compensation for lands transferred by their ancestors.  Nothing in this Order questions settled expectations or projects remedies into the future; the claims and the remedies are entirely retrospective in nature.

While this Order is consistent with Second Circuit and Supreme Court precedent, the Court recognizes that other courts have thoughtfully considered some of the issues discussed above and reached different conclusions.  See, e.g., Shinnecock Indian Nation v. New York, No. 05-CV-2887

(TCP), 2006 WL 3501099 (E.D.N.Y. Nov. 28, 2006) (Platt, D.J.).  This Order involves a controlling question of law as to which there is substantial ground for difference of opinion, and, pursuant to 28 U.S.C. § 1292(b), an immediate appeal would clarify the law and materially advance the termination of the litigation.  Therefore, while this Order does not dispose of the case in its entirety, the Court certifies this Order and the issues raised herein for immediate appeal.  Any party wishing to appeal this Order must apply to the Court of Appeals within ten (10) days.  28 U.S.C. § 1292(b).

Accordingly, it is hereby

**ORDERED**, that Defendants' Motion for summary judgment (Dkt. No. 582) is **GRANTED IN PART and DENIED IN PART**; and it is further

**ORDERED**, that Defendants' Motion for summary judgment (Dkt. No. 582) is **GRANTED with respect to Plaintiffs' possessory land claims**; and it is further

**ORDERED**, that Defendants' Motion for summary judgment (Dkt. No. 582) is **DENIED with respect to Plaintiffs' fair compensation claim** as explained above; and it is further

**ORDERED**, that Defendant Counties are **DISMISSED**; and it is further

**ORDERED**, that Defendant Counties' Counterclaims are **DISMISSED AS MOOT**; and it is further

**ORDERED**, that the United States' Motion to dismiss Defendant Counties' counterclaims (Dkt. No. 445) is **DISMISSED AS MOOT**; and it is further

**ORDERED**, that Plaintiffs' Motion to strike the defense that the Nonintercourse Act does not apply to Oneida land in New York (Dkt. No. 522) is **DISMISSED AS MOOT**; and it is further

**ORDERED**, that Defendants' Motion to reconsider the Court's Order striking their affirmative defense regarding the Treaty of Ft. Schuyler (Dkt. No. 546) is **DISMISSED AS**

31

**MOOT**; and it is further

     **ORDERED**, that, pursuant to 28 U.S.C. § 1292(b), this Order is **CERTIFIED FOR**

**APPEAL**; and it is further

     **ORDERED**, that the Clerk serve a copy of this Order on all parties.

     **IT IS SO ORDERED**.

DATED:     May 21, 2007
               Albany, New York

                         Lawrence E. Kahn
                         U.S. District Judge