**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

ONEIDA INDIAN NATION OF NEW YORK STATE, *also known as* ONEIDA INDIAN
NATION OF NEW YORK, *also known as* ONEIDA INDIANS OF NEW YORK; ONEIDA
INDIAN NATION OF WISCONSIN, *also known as* ONEIDA TRIBE OF INDIANS OF
WISCONSIN; THAMES BAND OF CANADA (ONEIDA),

                              Plaintiffs,

              and                                      Civ. No. 5:70-CV-35
                                                           (LEK)
UNITED STATES                                      Civ. No. 5:74-CV-187
                                                        (LEK/DRH)
                              Plaintiff-Intervener

              - v -

COUNTY OF ONEIDA, NEW YORK;
COUNTY OF MADISON, NEW YORK; STATE OF NEW YORK,

                              Defendants and Third-Party Plaintiffs.

**RANDOLPH F. TREECE**
**United States Magistrate Judge**

## TABLE OF CONTENTS

I. BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3–10

    A. Brief History of the Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3–7

    B. The Retainer Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8–9

    C. Summary of Arguments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9–10

II. JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11–23

    A. Federal Subject Matter Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11–12

    B. Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12–14

    C. Specific Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14–23

        1. Specific Jurisdiction Under the Retainer Agreement . . . . . . . . . . . . . . . 15–21

            a. Paragraph 10 of the Retainer Agreement . . . . . . . . . . . . . . . . . . . . 15–20

                i. Whether the Retainer Agreement was Terminated . . . . . . . 16–20

                ii. Whether the Motion is Untimely . . . . . . . . . . . . . . . . . . . . . . . 20

            b. Paragraph 5 of the Retainer Agreement . . . . . . . . . . . . . . . . . . . . . 20–21

2. Sovereign Immunity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21–23

III. PROFESSIONAL ETHICS AND BSK'S RIGHT TO A FEE . . . . . . . . . . . . . . . . . . . 23–54

    A. The NY and WI Oneida's Pre-1978 Ethical Claims . . . . . . . . . . . . . . . . . . . . . . . 24–41

        1. Conflicts of Interest and Failure to Disclose . . . . . . . . . . . . . . . . . . . . . . . 24–35

            a. Ethical Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24–26

            b. Application of Ethical Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26–35

        2. BSK's Withdrawal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35–39

        3. BSK Prevented the Nation from Seeking Other Attorneys . . . . . . . . . . . 39–41

    B. The NY Oneida's Post-1978 Ethical Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41–54

        1. Findings of Fact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41–46

        2. Application of Ethical Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46–51

        3. Effect of BSK's Improper Representation . . . . . . . . . . . . . . . . . . . . . . . . . . 51–54

IV. CALCULATION OF FEES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54–56

V. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56-57

## REPORT-RECOMMENDATION and ORDER[1]

Presently before the Court is Bond, Schoeneck & King, PLLC's (hereinafter "BSK") Motion to Have the Court Recognize Its Right to a Fee Pursuant to Retainer Agreement and Charging Lien in connection with its previous representation of the Oneida Nation.[2] Test Case Dkt. No. 55, Mot. for Att'y Fees; Reservation Case Dkt. No. 130, Mot. for Att'y Fees. Plaintiffs Oneida Indian Nation of New York (hereinafter "NY Oneidas") and the Oneida Indian Nation of Wisconsin (hereinafter

---

[1] This Motion was referred to the undersigned by Order of the Honorable Lawrence E. Kahn, now-Senior United States District Judge, who instructed this Court to submit proposed findings of fact and recommendations for the disposition of the Motion to the Honorable Thomas J. McAvoy, Senior United States District Court Judge. *See* Civil Case 5:70-CV-35 (Test Case) (LEK), Dkt. No. 99, Order, dated Nov. 18, 2002; Civil Case 5:74-CV-187 (LEK/DRH), Dkt. No. 463, Order, dated Nov. 18, 2002.

[2] BSK filed this Motion concurrently in two separate, but related, actions designated as Civil Case numbers 5:70-CV-35 (LEK) and 5:74-CV-187 (LEK/DRH). For reasons that will be explained below, the former will be referred to as the "Test Case," and the latter as the "Reservation Case." *See infra* Part I.A. Thus, when citing to documents and entries placed on the Test Case Docket, the docket number will be preceded by the identifier "Test Case," and likewise "Reservation Case" will precede any citation to the docket in that case.

"WI Oneidas") filed a Joint Opposition to the Motion, Test Case Dkt. No. 109, and in addition, the NY Oneidas filed a Separate Brief in Opposition, Test Case Dkt. No. 108.[3]  BSK filed a Reply to both the Joint Opposition and the NY Oneidas' Separate Brief.  Test Case Dkt. No. 112.  For the reasons that follow, it is recommended that BSK's Motion be **granted in part**.

## I. BACKGROUND

### A. Brief History of the Cases

In 1795, New York State purchased approximately 100,000 acres of the Oneidas' Reservation land without federal authorization and therefore in violation of the Non-Intercourse Act of 1790.[4]  *Oneida Indian Nation v. County of Oneida*, 434 F. Supp. 527 (D.C.N.Y. 1977), *aff'd in part, rev'd in part*, 470 U.S. 226 (1985).  In 1966, nearly two centuries later, the NY, WI, and Thames Band of Oneidas from Canada (hereinafter "CAN Oneidas") entered into a Retainer Agreement with BSK for the purpose of seeking compensation for Oneida lands that had been illegally purchased.[5]  Test Case Dkt. No. 56, George C. Shattuck, Esq., Decl., dated May 20, 1999, at ¶¶ 6 & 10.

At the time the Retainer Agreement was entered into, the legal landscape for Native-American land claims in New York was decidedly unfavorable towards would-be Native-American plaintiffs.  On the state side, New York courts had generally refused to hear Native-American land

---

[3] Plaintiff Thames Band of Canada (hereinafter "CAN Oneidas") have not filed opposition to BSK's Motion.

[4] The Non-Intercourse Act of 1790 "essentially requires federal consent for all land purchases from Indian nations and tribes."  *Oneida Indian Nation of New York v. State of New York*, 691 F.2d 1070, 1074 n.2 (2d Cir. 1982). Since its adoption, the Act has been amended several times and codified as 25 U.S.C. § 177.

[5] The history surrounding the Oneidas' land claims, which dates back to the Eighteenth Century and involves such prominent American figures as President George Washington and Governor and Supreme Court Justice John Jay, is worthwhile and important reading, particularly for citizens of New York State.  In that respect, reference is made to the summary of relevant historical facts found in the decision of the Honorable Edmund Port, United States District Judge, in the case of *Oneida Indian Nation of New York v. County of Oneida*, 434 F. Supp. 527 (D.C.N.Y. 1977).

claims, *see* Shattuck Decl. at ¶ 47 (citing cases); on the federal side, the doctrine known as the "well-pleaded complaint rule," which barred federal courts from exercising jurisdiction over Native-American claims that could be brought in state court, amounted to a tested and predictable roadblock, *see Taylor v. Anderson*, 234 U.S. 74 (1914); Shattuck Decl. at ¶ 50.  Upon researching the viability of the Oneida's potential claims, BSK identified the reality of this legal predicament, but nevertheless saw merit in the Oneidas' claim that New York State's purchase of Oneida lands violated the Federal Non-Intercourse Act of 1790.  Shattuck Decl. at ¶¶ 8 & 26.

BSK's strategy was essentially three-fold: (1) petition state and federal governmental agencies for a settlement; (2) if those petitions fail, persuade the United States to file suit against New York State on the Oneidas' behalf; and (3) if the prior two options fail, sue the State of New York directly.  *Id*. at ¶¶ 30, 45, & 86.  Despite several written and oral petitions to administrative agencies and government officials including the Governor of New York and Presidents Johnson and Nixon, the implementation of the first two phases of BSK's strategy proved to be futile.  *Id*. at ¶¶ 30-45.  As a consequence, BSK filed a claim in the Northern District of New York on behalf of the NY and WI Oneidas.[6]  *Id*. at ¶¶ 46-54.  This lawsuit will be referred to as the "Test Case."

In the Test Case, the Oneidas sued Madison and Oneida Counties, alleging that New York's purchase of 100,000 acres of Oneida land in 1795 violated the Non-Intercourse Act, and sought relief in the form of fair rental value for the land for a two-year period, 1968-1969.[7]  No private landowners were sued in the Test Case.  According to George Shattuck, BSK's lead attorney on the

---

[6] The CAN Oneidas were not added as Plaintiffs in the Test Case until 1975.  Shattuck Decl. at ¶ 98.

[7] The Nation also sought to preserve any claims for rental value for years both prior and subsequent to 1968-1969.  *Oneida Indian Nation of New York State v. Cnty. of Oneida*, 464 F.2d 916, 919 n.3 (2d Cir. 1972), *rev'd, Oneida Indian Nation of New York v. Cnty. of Oneida*, 414 U.S. 661 (1974).

Oneida Test case during the time period relevant to this Motion, "[t]he premise [of the lawsuit] was that the Oneidas still owned the land and were entitled to rent from its governmental occupants." *Id*. at ¶ 52.

The Honorable Edmund Port, United States District Judge, pursuant to the "well-pleaded complaint rule," dismissed the Test Case complaint for lack of jurisdiction. *Id*. at ¶ 56. The Oneidas appealed to the Second Circuit Court of Appeals, who, based on this seminal pleading doctrine, affirmed Judge Port's decision. *Oneida Indian Nation of New York v. New York Cnty. of Oneida*, 464 F.2d 916, 924 (2d Cir. 1972). BSK filed a petition for a writ of *certiorari* with the Supreme Court on behalf of the Oneidas, which was granted on the sole issue of federal question jurisdiction. Shattuck Decl. at ¶¶ 60 & 63; *Oneida Indian Nation of New York v. Cnty. of Oneida*, 412 U.S. 927 (1973). In a landmark decision, the Supreme Court unanimously reversed the Second Circuit's affirmation, holding that the Oneidas' possessory land claim was based on federal law and therefore the well-pleaded complaint rule posed no jurisdictional barrier to such action in federal court. *Oneida Indian Nation of New York v. Cnty. of Oneida*, 414 U.S. 661, 781-82 (1974) (hereinafter "*Oneida I*"). The case was remanded to the district court for trial.

BSK partners John Freyer and George Shattuck represented the Oneidas at trial. Shattuck Decl. at ¶ 88. Prior to the commencement of the trial, Judge Port agreed to trifurcate the case in order to determine the issues of: (1) liability, *i.e.*, whether the land belonged to the Oneidas; (2) damages; and (3) if damages were found, whether New York State should indemnify the Counties. Shattuck Decl. at ¶ 88. On November 13, 1975, during the first phase of the trial, the CAN Oneidas were admitted as a party-Plaintiffs to the suit. Shattuck Decl. at ¶ 98. For the purposes of analyzing this Motion, we will hereinafter refer to the three collective Oneida tribes as "the Nation." At trial,

Judge Port ruled in favor of the Nation on the issue of liability, finding that New York State violated the Non-Intercourse Act when it purchased the lands in question from the Oneidas in 1795. *Oneida Indian Nation of New York v. Cnty. of Oneida,* 434 F. Supp. 527.

After the Supreme Court's 1974 landmark ruling in *Oneida I*, BSK prepared and filed a new complaint on behalf of the Nation in the Northern District of New York, seeking rent and compensation from Oneida and Madison Counties for their use and possession of approximately 300,000 acres of Oneida land acquired in violation of the Non-Intercourse Act. That action will hereinafter be referred to as the "Reservation Case." Shattuck Decl. at ¶ 110. Then, in 1977, BSK decided to "withdraw from active participation in the Test and Reservation Cases." Shattuck Decl. at ¶ 133, Exs. 33 & 34. And in 1978, BSK withdrew as counsel of record in both cases. Reservation Case Dkt. No. 131, BSK's Mem. of Law at p. 10. At that point, liability had been established in the Test Case, but the issue of damages had yet to be resolved. In the Reservation case, dispositive motions had yet to be filed. *See generally* Dkts. for Test and Reservation Cases.

The trial on the damages phase of the Test Case began in 1981 before Judge Port, who ultimately assessed damages in the amount of $9,060 plus interest at six percent (6 %) per annum against Madison County, and $7,634 plus interest at six percent (6 %) per annum against Oneida County from January 1, 1968. BSK's Mem. of Law at pp. 8-9. Judge Port's decisions on liability and damages were appealed to the Supreme Court, which affirmed his rulings, but remanded for a re-calculation of damages. *Cnty. of Oneida v. Oneida Indian Nation of New York*, 470 U.S. 226 (1985) (hereinafter "*Oneida II*"). On remand, the case was reassigned to the Honorable Neal P. McCurn, now-Senior United States District Judge, who eventually entered a judgment against Oneida County in the amount of $8,360, and against Madison County in the amount of $9,910, both

with a prejudgment interest rate of six percent (6 %) per annum from January 1, 1968.  Test Case Dkt. No. 119, Am. J., dated May 6, 2003.  Per a stipulation between the parties, the Defendants deposited $57,494.87 with the Clerk of the Court.  Test Case Dkt. No. 121 & entries, dated Mar. 9, 2004.

Aside from settlement discussions between the Nation and New York State, the Reservation Case laid dormant until 1998, when the United States Department of Justice (DOJ) intervened on behalf of the Nation.  Reservation Case Dkt. No. 56, Order, dated June 2, 1998.  After many failed attempts at settlement through mediation, Amended Complaints were filed and dispositive motions were brought before the Honorable Lawrence E. Kahn, now-Senior United States District Court Judge.[8]  Judge Kahn granted in part and denied in part the Defendants' Motions to Dismiss and for Summary Judgment.  *Oneida Indian Nation of New York v. New York*, 194 F. Supp. 2d 104 (N.D.N.Y. 2002) (denying in part and granting in part motion to dismiss); *Oneida Indian Nation of New York v. New York*, 500 F. Supp. 2d 128 (N.D.N.Y. 2007) (denying in part and granting in part motion for summary judgment).  The Second Circuit subsequently granted leave to the parties to make interlocutory appeals of Judge Kahn's orders on the dispositive motions.  Reservation Case Dkt. entry, dated July 20, 2007.  On January 7, 2011, the Second Circuit issued a Mandate, based upon its August 9, 2010 Opinion, that affirmed in part, reversed in part, and remanded the case back to the District Court for an entry of judgment and resolution of any pending motions.  *See* Reservation Case Dkt. No. 622, Mandate; *Oneida Indian Nation of New York v. New York State*, 617 F.3d 114 (2d Cir. 2010).  Accordingly, a Judgment in Defendants' favor was issued and the case was dismissed.  Reservation Case Dkt. No. 623, Judgment, dated Jan. 10, 2011.

---

[8] The Reservation Case was reassigned to Judge Kahn on January 3, 2001.  Reservation Case Dkt. No. 192.

## B.  The Retainer Agreement

The Retainer Agreement placed a duty on BSK to advise and represent the Nation "against the State of New York in respect of their former lands in New York State," and specified that BSK's remuneration would be "contingent upon a recovery for the Nation from the State of New York, or any political sub-division or department of it."  Shattuck Decl., Ex. 1, Retainer Agreement, dated June 24, 1966, at ¶¶ 1 & 4.  The amount of the contingency fee was set at twenty percent (20%) of any amount recovered up to $1,000,000, and ten percent (10%) of any amount recovered in excess of $1,000,000.  *Id.* at ¶ 5.  However, if the DOJ intervened, assumed responsibility for the claim, and was successful, any fee due to BSK would be determined by the Secretary of the Interior "on a quantum meruit basis."  *Id.*

The Retainer Agreement was submitted to the Secretary of the Interior/Department of the Interior (hereinafter "DOI") for approval as required by 25 U.S.C. § 81.[9]  The Secretary required the implementation of certain revisions to the Retainer Agreement prior to its approval.  Paragraph 10 was amended, and Paragraph 13 was added.[10]  Amended Paragraph 10 states:

> This contract may be terminated on 60 days written notice by the Secretary of the Interior or his authorized representative; or by the Oneida Indian Nation of New York State and the Oneida Tribe of Indians of Wisconsin with the consent of the Secretary of the Interior or his authorized representative; or by the attorneys.  If the contract shall be so terminated, except for the wrongdoing or dereliction of the attorneys, the attorneys shall be credited with such share in the attorney fee as the

---

[9] Passed by Congress in 1871-72, 25 U.S.C. § 81 originally required that contracts concerning Indian lands be approved by the Secretary of the Interior.  Without such approval, any contract falling within the scope of the statute was ineffectual.  The Supreme Court has stated that the law was "intended to protect the Indians from improvident and unconscionable contracts."  *In re Sanborn*, 148 U.S. 222, 227 (1893).  25 U.S.C. § 81 was thereafter amended in 1958 and 2000.

[10] DOI also required that Paragraphs 6 and 8 of the original Retainer Agreement be deleted.  Deleted Paragraph 6 provided for increased contingency fees in the event any appeal(s) was taken; deleted Paragraph 8 provided that the intervention of the United States Attorney General or the Department of Justice would not affect the fees due to BSK if BSK continued to handle the claim.  Shattuck Decl, Ex. 1, Retainer Agreement at ¶¶ 6 & 8.

court or tribunal finally determining the Oneidas' claim may determine to be equitable; provided, that such fee shall be wholly contingent upon a recovery for the Oneidas and; provided further, that if there be a recovery without submission to a court or tribunal then said fee to be in such amount as the Secretary of the Interior or his authorized representative may find to be equitable.

*Id*., Ex. 1, Am. to Retainer Agreement at ¶ 2 (adding ¶ 10).

Paragraph 13 states: "This agreement shall be in force for a term of ten (10) years beginning with the date of approval by the Secretary of the Interior or his authorized representative." *Id*. at ¶ 3 (adding ¶ 13). DOI granted approval of the Agreement on March 28, 1967. *Id*. The composite parts of the Retainer Agreement finally approved by the Secretary of the Interior will hereinafter be referred to simply as the "Retainer Agreement." In 1974, three years before the Retainer Agreement was set to expire, upon the agreement of the parties and DOI, the Retainer Agreement was extended for a period of five (5) years, with a new expiration date of March 28, 1982. Test Case Dkt. No. 107, Michael R. Smith, Decl., dated Aug. 15, 2002, Ex. 10, Lt. Approving Extension Agreement, dated Apr. 19, 1974.

### C. Summary of Arguments

BSK asserts that it is entitled to attorney's fees pursuant to Paragraph 10 of the Retainer Agreement and New York Judiciary Law § 475, which imposes a charging lien upon a client's cause of action when that client's attorney has made an appearance in that action. N.Y. JUD. LAW § 475.[11] BSK asserts that, pursuant to its charging lien and the terms of the Retainer Agreement, it is

---

[11] New York Judiciary Law § 475 states:

From the commencement of an action, special or other proceeding in any court or before any state, municipal or federal department, except a department of labor, or the service of an answer containing a counterclaim, the attorney who appears for a party has a lien upon his client's cause of action, claim or counterclaim, which attaches to a verdict, report, determination, decision, judgment or final order in his client's favor, and the proceeds thereof in whatever hands they may come; and the lien cannot be affected by any settlement between the parties before or after judgment, final order or determination. The court upon the petition of the client or attorney may determine and enforce the lien.

"entitled to an equitable share of the 10% fee that the firm would have received, had it not withdrawn."  BSK's Mem. of Law at p. 16.

The NY and WI Oneidas argue that BSK is not entitled to any fee because: (1) BSK does not have a valid charging lien pursuant to § 475 because it did not withdraw "for good cause;" (2) § 475 does not apply in this case because it is preempted by 25 U.S.C. § 81 and barred by the doctrine of tribal sovereign immunity; (3) if § 475 does apply, the applicable six (6) year statute of limitations (SOL) bars BSK's claim; (4) the Retainer Agreement expired by its own terms in 1982 and is not now "in force;" (5) Paragraph 10 of the Retainer Agreement does not apply because BSK never "terminated" the Retainer Agreement, but rather, "withdrew" as the attorneys of record in the Test and Reservation cases; (6) pursuant to Paragraph 5 of the Retainer Agreement, any fee owed BSK must be determined by the Secretary of the Interior because the United States Attorney General intervened in the case in 1998; (7) if Paragraph 10 of the Retainer Agreement applies, BSK has forfeited any fee as a consequence of its alleged unethical conduct which constitutes "wrongdoing or dereliction" under the terms of Paragraph 10; and (8) BSK's claim is not yet ripe because there has been no final determination of the Nation's claims.  Test Case Dkt. No. 109, Joint Opp'n to Mot. for Att'y Fees at pp. 16-21.

The NY Oneidas also filed a Separate Opposition to BSK's Motion wherein they accuse BSK of disloyalty and breach of fiduciary duty stemming from alleged acts taken during the 1980's and early 1990's.  Test Case Dkt. No. 108, Separate Opp'n to Mot. for Att'y Fees.  The NY Oneidas argue that as a consequence of those alleged actions, BSK has forfeited any right to attorney's fees as against the NY Oneidas.  *Id.* at p. 12.

*-10-*

## II. JURISDICTION

### A. Federal Subject Matter Jurisdiction

Although the Supreme Court has never addressed the issue, it is doubtful that the approval of a contract by the Secretary of the Interior under 25 U.S.C. § 81 by itself creates federal subject-matter jurisdiction in a routine breach of contract claim, because nothing in that statute creates an independent cause of action for a party to such a contract. *See Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians*, 862 F. Supp. 995 (W.D.N.Y. 1994) ("[C]laims based on [a contract] are not converted to federal claims merely because one of the parties to the agreement is an Indian tribe."); *TTEA v. Ysleta del Sur Peublo*, 181 F.3d 676, 681 (5th Cir. 1999) ("The federal courts do not have jurisdiction to entertain routine contract actions involving Indian tribes.") (citation omitted); *see also Littell v. Nakai*, 344 F.2d 486, 488 (9th Cir. 1965) (federal court lacked jurisdiction in a breach of contract claim where the contract was approved under 25 U.S.C. § 81 because "the real substance of the controversy centers upon the contract and its construction rather than the statutory basis for the contract[.]" (citation omitted)); *cf. Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 72 (1978) (holding that the Indian Civil Rights Act, 25 U.S.C. §§ 1301-1341, did not create an independent cause of action against Indian tribes for declaratory or injunctive relief).

However, the very terms of the Retainer Agreement give this Court subject matter jurisdiction as does the doctrine of supplemental jurisdiction. Both the Test and Reservation Cases originated in this Court. The Court therefore finds that it has supplemental jurisdiction over this Motion pursuant to 28 U.S.C. § 1367. *Itar-Tass Russian News Agency v. Russian Kurier Inc*., 140 F.3d 442, 444 (2d Cir. 1998) (holding that, pursuant to 29 U.S.C. § 1367, the district court should have exercised supplemental jurisdiction over a claim for attorneys' fees); *see also Louima v. City*

*of New York*, 2004 WL 2359943, at *55 (E.D.N.Y. Oct. 5, 2004) (stating that federal courts have "the authority to determine attorney's fee disputes and regulate attorney's fee liens") (internal citation and quotation marks omitted).[12]

## B.  Applicable Law

As previously noted, BSK seeks recognition of a right to attorney's fees pursuant to its alleged charging lien and the Retainer Agreement, a contract.  Before this Court can make a recommendation as to the rights and responsibilities contained in the Retainer Agreement, it must first determine what law governs.  A leading treatise on Indian law from the time the contract was entered into suggests that in most cases, "the ordinary rules of the common law with respect to the execution and interpretation of contracts have been applied [to contracts between Indian tribes and third parties], by common consent of the parties."  Felix S. Cohen, COHEN'S HANDBOOK OF FEDERAL INDIAN LAW (1971).  No such common consent, in the form of a choice of law clause or otherwise, is present in the Retainer Agreement.  For that reason, the NY and WI Oneidas assert that there is no "room to invoke state law to supplement a federally-approved contract," and that "BSK could have tried to incorporate state law principles in its contract expressly, permitting Interior to approve it or not."  Joint Opp'n at p. 13.

It is settled law that Indian relations fall within "the exclusive province of federal law." *Oneida II*, 470 U.S. at 234.  Pursuant to federal law governing Indian relations, the Retainer Agreement was approved by the Secretary of the Interior under 25 U.S.C. § 81.  However, nothing

---

[12] A court may properly consider a motion for attorney's fees prior to the final disposition of a case, even though a determination of the amount of any such fees must await final disposition because of the particular circumstances of the case. *See, e.g., Casper v. Lew Lieberbaum & Co.,* 1999 WL 335334, at *9 (S.D.N.Y. May 26, 1999) (granting attorneys' request for a charging lien but withholding on a determination of the amount of the lien until the conclusion of the case).  However, the Court decided not to proceed immediately and awaited a final disposition in  both the Test and Reservation cases.

in 25 U.S.C. § 81 nor its companion statutes purport to create an entirely separate body of federal common law governing contracts with Indians. *See generally* 25 U.S.C. § 81, *et seq*. Indeed, the Second Circuit Court of Appeals has rejected the proposition "that [the] statutory requirements governing federal approval of certain contracts between Indians and non-Indians give rise to a federal common law governing such contracts." *Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians*, 94 F.3d 747, 753 (2d Cir. 1996) (citing *Gila River Indian Cmty. v. Hanningson, Durham & Richardson*, 626 F.2d 708, 714-15 (9th Cir. 1980)); *cf. A.K. Mgmt. Co. v. San Manuel Band of Mission Indians*, 789 F.2d 785, 789 (9th Cir. 1986) ("[I]t is doubtful that general contract principles apply to an agreement subject to 25 U.S.C. § 81 (1982).").[13]

The Second Circuit's rejection of the existence of a federal common law governing Indian contracts is congruent with the longstanding rule first enunciated in *Erie R.R. Co. v. Tompkins,* that "[e]xcept in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state." 304 U.S. 64, 78 (1938).[14]  25 U.S.C. § 81 requires the government's approval of certain contracts with Indians, but it does not prescribe or reference a

---

[13] The NY and WI Oneidas cite to *A.K. Mgmt.Co. v. San Manuel Band of Mission Indians* in support of their argument that state law contract principles do not apply to contracts governed by 25 U.S.C. § 81. Joint Opp'n at p. 13. However, the Ninth Circuit's statement that it doubted whether general contract principles apply to contracts subject to 25 U.S.C. § 81 must be read in context. In that case, the Ninth Circuit was presented with the question of whether a contract not approved by the Secretary of the Interior as required by 25 U.S.C. § 81 was nonetheless valid and binding on the parties. *A.K. Mgmt. Co. v. San Manuel Band of Mission Indians*, 789 F.2d at 785-86. In deciding that is was not, the Ninth Circuit held that Indian tribes are not subject to any common law duty to seek approval by the Secretary of the Interior. *Id.* Thus, the Ninth Circuit held that no common law duties apply to an Indian tribe when a contract has not been validated and approved by the Secretary of the Interior. It did not hold that state common law of contracts does not apply to a contract once it has been approved by the Secretary of the Interior pursuant to 25 U.S.C. § 81. In any event, that decision does not constitute controlling authority in this District.

[14] Under *Erie*, there is generally no federal common law. However, there are exceptions to that rule, including Indians' "federal common-law right to sue to enforce their aboriginal lands," first explicitly recognized by the Supreme Court in the Test Case as a result of BSK's efforts. *Oneida II*, 470 U.S. at 229 (summarizing the court's ruling in *Oneida I*). The Supreme Court's recognition of a federal common law cause of action for Indian land claims did not also include a recognition of a federal common law action for breach of contract between Indian tribes and third parties. That this particular contract concerned legal services for the Nation's land claims does not situate it within that limited body of federal common law.

specific body of law to govern such contracts.  Therefore it cannot be said that federal law governs all aspects of contracts approved by the Secretary of the Interior pursuant to 25 U.S.C. § 81.  *See In re Sanborn,* 148 U.S. 222, 227 (1893).

Accepting as we must the Second Circuit's conclusion that there is no federal common law governing contracts with Indians, state contract law must be applied to the extent that federal Indian law does not override it.  *Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians*, 94 F.3d at 747 (cited in *United States ex rel. The Saint Regis Mohawk Tribe v. President R.C.–St. Regis Mgmt. Co.*, 451 F.3d 44, 51 n.6 (2d Cir. 2006)).  To hold otherwise would effectively place the Court's consideration of this Motion in a legal vacuum.[15]  Therefore, because this action was filed in a district court within the State of New York, for the purposes of analyzing and defining the rights and responsibilities conferred on the parties by the Retainer Agreement, New York State law governs to the extent it is not preempted by federal law.[16]  *Schiavone Const. Co. v. City of New York*, 99 F.3d 546, 548 (2d Cir. 1996) (applying New York substantive law because the action was filed in a district court in that state).

## C.  Specific Jurisdiction

Although this Court has subject-matter jurisdiction over BSK's Motion, that does not end the jurisdictional discussion.  We must still determine: (1) whether the terms of the Retainer Agreement grant or preclude specific jurisdiction upon or from this Court; and (2) whether the NY

---

[15] In that respect, it is notable that even as the NY and WI Oneidas assert that New York law does govern this claim for attorney's fees, they cite New York law extensively in support of their argument that BSK forfeited its claim to a fee by engaging in unethical conduct and for its arguments regarding how the Court should calculate attorney's fees if it deems they are warranted.  Joint Opp'n at pp. 16-25.

[16] A separate question exists as to whether the NY and WI Oneidas' sovereign immunity precludes this Court's jurisdiction over this Motion.  That issue is addressed *infra* in Part II.C.1.  *See, e.g., Ninigret Dev. Corp. v. Narragansett Indian Wetuomock Housing*, 207 F.3d 21, 28 (1st Cir. 2000) (consideration of tribal sovereign immunity "always must await resolution of the antecedent issue of federal subject-matter jurisdiction").

and WI Oneidas' sovereign immunity under federal Indian law precludes this Court's jurisdiction over BSK's Motion.

### 1. *Specific Jurisdiction under the Retainer Agreement*

#### a. Paragraph 10 of the Retainer Agreement

Paragraph 10 of the Retainer Agreement states:

> This contract may be terminated on 60 days written notice by the Secretary of the Interior or his authorized representative; or by the Oneida Indian Nation of New York State and the Oneida Tribe of Indians of Wisconsin with the consent of the Secretary of the Interior or his authorized representative; or by the attorneys. If the contract shall be so terminated, except for the wrongdoing or dereliction of the attorneys, the attorneys shall be credited with such share in the attorney fee as the court or tribunal finally determining the Oneidas' claim may determine to be equitable; provided, that such fee shall be wholly contingent upon a recovery for the Oneidas and; provided further, that if there be a recovery without submission to a court or tribunal then said fee to be in such amount as the Secretary of the Interior or his authorized representative may find to be equitable.

Retainer Agreement at ¶ 10.

The NY and WI Oneidas make two arguments in support of their claim that this Court does not have jurisdiction over BSK's Motion under Paragraph 10: (1) the Retainer Agreement was never terminated, Joint Opp'n at pp. 5-8; and (2) BSK's Motion is untimely because this Court does not have jurisdiction until such time as it finally determines the underlying claims, Joint Opp'n at pp. 8-9.[17] These arguments are considered *ad seriatim*.

---

[17] The NY and WI Oneidas also argue that BSK has forfeited its fee because, if the Retainer Agreement is deemed to have been terminated, it was done so as a consequence of BSK's foreseeable ethical conflicts, constituting "wrongdoing and dereliction" under Paragraph 10. Irrespective of the merits of that argument, Paragraph 10 does not condition this Court's jurisdiction upon an initial determination that the contract was terminated absent "wrongdoing and dereliction" on the part of BSK, but rather, directs the Court to deny equitable attorney's fees in the event that such argument is meritorious. Thus, that argument does not impact our jurisdictional discussion, but will be discussed later in this Report-Recommendation as it relates to a fee award. *See infra* Part III.

-15-

*i.  Whether the Retainer Agreement was Terminated*

BSK asserts that pursuant to the express language of Paragraph 10, they are entitled to attorney's fees to be determined by the Court on an equitable basis because the contract was terminated without any wrongdoing on their part.   The NY and WI Oneidas contend that the instructions of Paragraph 10 are inapplicable because BSK never *terminated* the Retainer Agreement, but rather, *withdrew* from representation in the Test and Reservation Cases.   In support of their argument, the NY and WI Oneidas reference a letter from George Shattuck to Jacob Thompson, then Claims Representative for the NY Oneidas, dated April 25, 1977, wherein Shattuck stated:

> We are pleased to advise you that we have received a letter from the U.S. Department of Justice advising that they will bring legal action on your behalf with respect to your land claims in the State of New York.   It appeared at our April 7, 1977 meeting with the Department of the Interior and the Department of Justice that such action would be forthcoming but it is well to receive such a commitment in writing.   We enclose a copy of the letter dated April 21, 1977.[18]
>
> In light of this most significant development we should review with you the strategy thus far pursued by the Oneidas and consider whether our approach to the problem should be changed in any way.   As you are aware the strategy up to this point has been to accomplish recompense and justice for the Oneidas without damaging private property owners or causing economic hardship in the area.

Smith Decl., Ex. 23 at p. 1.

Shattuck went on to explain that because the legal climate had changed as a consequence of their victory in the Supreme Court in *Oneida I*, a new possibility of bringing valid ejectment actions against private landowners existed.   However, Shattuck wrote that BSK was "unable to represent

---

[18] The April 21, 1977 Letter was from the DOI, not the DOJ.  Smith Decl., Ex. 24, Lt., dated Apr. 21, 1977. In it, the DOI informed Shattuck that "the Solicitor will recommend to the Department of Justice that an action be brought before July 18, 1977, on behalf of the Oneida Nations seeking ejectment and damages against those persons claiming an interest in the lands confirmed to the Oneida Nation in the Treaty with the Six Nations, 7 Stat. 44 (1794)." *Id.*  For reasons not made apparent on the record, the United States did not intervene in the action until 1998. *See* Reservation Case Dkt. Nos. 48, USA Mot. to Intervene & 56, Order Granting Mot. to Intervene.

or advise [the Nation] with respect to potential actions against the private landowners." *Id*. at p. 3.

As a consequence, Shattuck wrote, BSK had come to the conclusion that

> there are substantial questions concerning our ability fairly and adequately to represent you on either the issue of whether to make the strategy change or the implementation of the new strategy, if it is adopted.
>
> For these reasons, it is our opinion that it is in your best interests that you obtain counsel to advise you as to the possible strategy change and your future actions[.]

*Id.* at pp. 3-4.

Although Shattuck was recommending that the Nation find different counsel with respect to potential actions against private landowners, he made clear that BSK did not

> intend this letter to be a "termination" of your retainer contract, but rather a statement that, with the entry of the Department of Justice, we have accomplished essentially what we were retained to do: Open the federal courts to you and get the U.S. to bring suit in your behalf.

*Id*. at p. 5.

The NY and WI Oneidas also point out that BSK continued to send annual reports to the Secretary of the Interior, as required by Paragraph 11 of the Retainer Agreement, from 1977 through 1982. The reports filed for the years 1979-1982 all state the following:

> As you may know, this firm is not actively representing the Oneidas in the current litigation on their land claims due to our concern about potential conflicts of interest. However, we still remain of counsel for the Oneidas under our retainer contract and do render services from time to time.

Smith Decl., Ex. 29, Rpts. to Dep't of the Interior, dated Mar. 25, 1980, Mar. 31, 1981, Apr. 13, 1982, & Mar. 1, 1983.

Notwithstanding BSK's representation to the Nation in its April 25, 1977 Letter that it did not intend to terminate the Retainer Agreement, it is clear that the relationship between BSK and the Nation was fundamentally altered upon BSK's withdrawal as counsel of record in the Test and Reservation cases in 1978. After their withdrawal in 1978, BSK no longer represented the Nation in its land claims. Although George Shattuck continued to advise and counsel the Nation "in

*-17-*

accordance with [BSK's] intent to help the Oneidas however possible in their pursuit of their claims," the primary responsibility for the land claim litigation fell on the Native American Rights Fund (NARF), who was substituted as counsel in 1978.  Shattuck Decl. at ¶¶ 135-36.  In a March 17, 1978 Letter to the Nation, George Shattuck explained that he foresaw BSK's role from that point forward as "helping to supply information where we can, but leaving court appearances and strategy and policy decisions to counsel who have no potential conflicts."  Smith Decl., Ex. 26, Lt., dated Mar. 17, 1978.

The Retainer Agreement, by its express terms, placed upon BSK the responsibility to both "advise" and "represent" the Nation in connection with their land claims.  Retainer Agreement at ¶¶ 1-2.  The contingency fee articulated in the Retainer Agreement was agreed to as consideration for BSK's services as both advisor and representative as to their land claims.  Thus, BSK's withdrawal from representation constituted a change in the nature and extent of the services that were contemplated under the Retainer Agreement.  Besides extending the Retainer Agreement until 1982, neither BSK nor the Nation agreed to amend the terms of the Retainer Agreement, nor did they seek to have a new contract approved by the DOI as required by 25 U.S.C. § 81.  Therefore, we find that BSK's statements to the Nation that it intended to withdraw, along with the subsequent official substitution of BSK as counsel of record in the Test and Reservation Cases, constituted a declaration that it could not perform all of the services specified in the Retainer Agreement.

Despite this change in the nature and extent of the services BSK provided to the Nation after 1978, there is substantial evidence in the record that notwithstanding its withdrawal as counsel of record, BSK did not consider the Retainer Agreement to be terminated.  First, George Shattuck's April 25, 1977 Letter specifically stated that he did not intend to terminate the Retainer Agreement.

*-18-*

Smith Decl., Ex. 23, Lt., dated Apr. 25, 1977, at p. 5.  Second, BSK continued to send annual reports to the DOI until the Retainer Agreement expired by its own terms in 1982.  *Id*., Ex. 29, Lts. to Dep't of the Interior, dated Mar. 25, 1980, Mar. 31, 1981, Apr. 13, 1982, & Mar. 1, 1983.  Third, in 1979, BSK sent a letter to the DOI stating that BSK was entitled to a contingency fee, and noting that the "retainer contract dated June 24, 1966, and approved July 24, 1967 (extension approved on April 19, 1974), runs to March 28, 1982."  *Id*., Ex. 27, Lt., dated May 14, 1979.  There is little evidence on the record speaking to the Nation's understanding of the legal significance of BSK's withdrawal, however, Jacob Thompson, the President of the NY Oneidas at that time, states in his Affidavit that "[t]he Oneidas of NY did not object at all to [BSK] withdrawing as counsel and understood that other attorneys should be consulted[.]  Shortly thereafter, Mr. Bertram Hirsch, an attorney from Long Island, who did not have clients in the [disputed] land claim area, became the attorney for the Oneida Indian Nation of New York."  Test Case Dkt. No. 110, Jacob Thompson, Aff., dated Nov. 22, 2002, at ¶ 26.  At a minimum then, Mr. Thompson understood that BSK's withdrawal meant that a new attorney would represent the Nation in the Test and Reservation Cases.

Paragraph 9 of the Retainer Agreement stipulates that "[n]o assignment of the obligations of this contract, in whole or in part, shall be made without the consent, previously obtained, of the Nation and the Secretary of the Interior or his authorized representative."  Neither party has asserted, and the record does not reflect, that any attempt was made to *assign* any of BSK's obligations under the Retainer Agreement to the Nation's substituted counsel.  Nor does the record reflect that any attempt was made to amend the Retainer Agreement in order to memorialize a new agreement that did not include the duty of representation.  Indeed, if such a new agreement had been reached, the Secretary of the Interior's approval would have been required under 25 U.S.C. § 81.  Therefore,

BSK's 1978 withdrawal and the Nation's acceptance of that withdrawal, notwithstanding BSK's suggestions and actions to the contrary, effectively terminated the Retainer Agreement.

### ii. *Whether the Motion is Untimely*

Paragraph 10 of the Retainer Agreement states that if the attorneys terminate the Retainer Agreement, their compensation will be decided as the "court or tribunal *finally determining* the Oneidas' claim may determine to be equitable."  Retainer Agreement at ¶ 10 (emphasis added). When the NY and WI Oneidas filed their Opposition, they argued that because no final determination had been reached in the Reservation Case, BSK's Motion is untimely.  Joint Opp'n at p. 8.  However, both the Test and Reservation cases now have final determinations, which renders any discussion as to timeliness moot.

### b. Paragraph 5 of the Retainer Agreement

Paragraph 5 of the Retainer Agreement states that "[i]f the United States Department of Justice assumes the responsibility of handling the claim, the fee of the Attorneys shall be fixed by the Secretary of the Interior on a quantum meruit basis if said Department of Justice is successful in obtaining a recovery."  The NY and WI Oneidas argue that this Court lacks jurisdiction under Paragraph 5 because the DOJ has intervened in the case, and therefore the Secretary of the Interior should determine the question of attorney fees.  Joint Opp'n at pp. 2-5.

The record shows that the DOJ intervened in the Reservation Case in 1998.  Reservation Case Dkt. Nos. 48, USA Mot. to Intervene & 56, Order Granting Mot. to Intervene.  As previously discussed, the Retainer Agreement with BSK was terminated in 1978, invoking the directions of Paragraph 10.  Paragraph 5 stipulates that if the DOJ takes responsibility for the case from BSK, the latter's fee will be determined by the Secretary of the Interior.  However, BSK's responsibility for

the cases ended when they terminated the Retainer Agreement in 1978.  BSK's obligations under the Retainer Agreement were not assumed nor was the contract extended by the Nation's subsequent counsel.  Therefore, the DOJ cannot assume the responsibility for handling the claim from BSK because BSK had no responsibility to relinquish in 1998.

The NY and WI Oneidas argue that even if the Retainer Agreement was terminated, Paragraph 5 still applies because the DOJ has intervened, essentially positing that Paragraph 5 supercedes Paragraph 10.  *Id*. at pp. 3-5.  There is nothing in the Retainer Agreement to suggest that Paragraph 5 supercedes Paragraph 10, nor is there any other reason for the Court to follow such an interpretation.  Both Paragraphs offer contingency plans for two different scenarios in which BSK would be relieved of its obligations specified in the Retainer Agreement: Paragraph 10 concerns what happens in the event the contract is terminated prior to recovery; Paragraph 5 concerns what happens in the event the DOJ assumes control of the claims from BSK prior to recovery.  If the DOJ had intervened prior to the termination of the Retainer Agreement in 1978, there would be no reason for us to consider Paragraph 10.  Equally then, because the contract was terminated prior to the DOJ's intervention, there is no reason to consider Paragraph 5 and the instructions of Paragraph 10 must be followed.[19]

## 2.  *Sovereign Immunity*

The NY and WI Oneidas assert that their tribal sovereign immunity precludes this Court's jurisdiction over this Motion.  It is well-settled that tribes maintain sovereign immunity against civil claims unless (1) Congress has waived said immunity by statute, or (2) the tribe has "unequivocally expressed" its intent to waive it.  *Santa Clara Pueblo v. Martinez*, 436 U.S. at 58 (citing *United*

---

[19] It is therefore unnecessary for us to determine whether the DOJ "assume[d] the responsibility of handling the claim" by its intervention in 1998.

*States v. Testan,* 424 U.S. 392 (1976)).  Nonetheless, while an Indian tribe's waiver of its sovereign immunity must be clear, it has never been held that clarity requires the use of the words "sovereign immunity."  *C & L Enters., Inc., v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 532 U.S. 411, 420 (2001) (citing *Sokaogon Gamin Enter. Corp. v. Tushie-Montgomery Assocs., Inc*., 86 F.3d 656, 659-660 (7th Cir. 1996)).

The NY and WI Oneidas assert that they have made "no waiver that would permit either a judicial or administrative judgment or order regarding fees."  Joint Opp'n at p. 15.  However, Paragraph 10 of the Retainer Agreement states that if the contract is terminated by the Nation, the attorneys, or the Secretary of the Interior, "the attorneys shall be credited with such share in the attorney fee as the court or tribunal finally determining the Oneidas' claim may determine to be equitable."

In *C & L Enters., Inc., v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, the Supreme Court held that a tribe's express consent to arbitration in a contract was a clear waiver of its sovereign immunity.  532 U.S. at 420.  In that case, the Potawatomi Tribe of Oklahoma argued that because the contract did not name a specific judicial forum in which to enforce the decision of the arbitrator, sovereign immunity was not waived.  *Id*. at p. 421.  The Supreme Court rejected that argument, holding that the consent to arbitration in the contract "memorialize[d] the Tribe's commitment to adhere to the contract's dispute resolution regime," thus constituting a waiver of sovereign immunity.  *Id*. at p. 422.

In the instant case, Paragraph 10 of the Retainer Agreement unambiguously proclaims that the court which finally determines the Nation's claims is the specific judicial forum that has the authority to determine attorney's fees in the event the contract is terminated.  Therefore, Paragraph

10 constitutes an even more explicit waiver of sovereign immunity than the arbitration clause at issue in *C & L Enters., Inc*., which clause the Supreme Court determined to be a waiver of sovereign immunity.  As such, the NY and WI Oneidas' sovereign immunity is abrogated to the extent delineated in Paragraph 10, which by its application gives this Court express jurisdiction to determine on an equitable basis what compensation, if any, BSK is due.

### III.  PROFESSIONAL ETHICS AND BSK'S RIGHT TO A FEE

Paragraph 10 of the Retainer Agreement states that if the contract is terminated, "*except for the wrongdoing or dereliction of the attorneys*, the attorneys shall be credited with such share in the attorney fee as the court or tribunal finally determining the Oneidas' claim may determine to be equitable." (emphasis added).  According to the NY and WI Oneidas, BSK has forfeited any right to attorney's fees because their conduct constitutes "wrongdoing or dereliction" under Paragraph 10, and because the application of ethical standards requires such consequence.  Joint Opp'n at pp. 16-22.

Specifically, the NY and WI Oneidas make the following arguments: (1) By virtue of the fact that BSK had attorneys, family members of attorneys, and clients with vested proprietary interests in land parcels located within the 300,000 acre plot that was alleged to have been obtained in violation of the Non-Intercourse Act, BSK had a conflict of interest from the outset of its representation of the Nation because the Nation sought to assert its own proprietary rights over that land; (2) BSK could not ethically represent all three Oneida tribes concurrently; (3) BSK withdrew without good cause because its conflicts were extant in 1978 and foreseeable, and because BSK's motive for withdrawal was its perceived "diminishing returns" on the case and not because of any ethical conflict; (4) BSK failed to disclose its conflicts to the Nation and to the Secretary of the

Interior; and (5) BSK "kept the Oneidas away from other lawyers."  Joint Opp'n at pp. 16-22.

In addition to these aforementioned arguments, the NY Oneidas allege in a separate brief that BSK engaged in unethical conduct and wrongdoing after their withdrawal in 1978, and should be denied attorney's fees from the NY Oneidas on that basis as well.  Test Case Dkt. 109, Separate Opp'n.  We address first the NY and WI Oneidas' pre-1978 ethical claims.

### A. The NY and WI Oneidas' Pre-1978 Ethical Claims

1. *Conflicts of Interest and Failure to Disclose*

a. Ethical Standards

Because the Retainer Agreement was entered into in 1967, it is necessary to briefly examine the applicable professional ethical standards from that time.  On January 1, 1970, the Model Code of Professional Responsibility (hereinafter "the Code") became the effective professional standard adopted by the New York State Bar Association.  *See* N.Y. JUD. LAW App. at 351 (McKinney 1975). Prior to the adoption of the Code in 1970, the New York State Bar Association followed the Canons of Professional Ethics first promulgated by the American Bar Association in 1908.  Thus, the form and packaging of the ethical standards changed during the lifetime of the Retainer Agreement from 1967 to 1978, however the content of those standards in relation to conflicts of interest remained consistent.

Canon 6 of the Canons of Professional Ethics (pre-1970) concerning adverse influences and conflicting interests stated:

> It is the duty of a lawyer at the time of retainer to disclose to the client all the circumstances of his relations to the parties, and any interest in or connection with the controversy, which might influence the client in the selection of counsel.
> It is unprofessional to represent conflicting interests, except by express consent of all concerned given after a full disclosure of the facts.  Within the meaning of this canon, a lawyer represents conflicting interests when, in behalf of

*-24-*

one client, it is his duty to contend for that which duty to another client requires him to oppose.

> The obligation to represent the client with undivided fidelity and not to divulge his secrets or confidences forbids also the subsequent acceptance of retainers or employment from others in matters adversely affecting any interest of the client with respect to which confidence has been reposed.

HENRY S. DRINKER, LEGAL ETHICS 311 (Columbia Univ. Press 1953); *see also Consol. Theatres v. Warner Bros. Circuit Mgmt. Corp.*, 216 F. 2d 920, 924 n.3 (2d Cir. 1954).

The Code, adopted in 1970, is comprised of distinct but interrelated parts: Canons, Ethical Considerations (hereinafter "EC's"), and Disciplinary Rules (hereinafter "DR's"). *The Lawyer's Code of Professional Responsibility*, N.Y. State Bar Ass'n, effective Jan. 1, 1970, at p. 1 (hereinafter "Code of 1970"). The Canons are "axiomatic norms, expressing in general terms the standards of professional conduct expected of lawyers." *Id*. at p. 2. EC's are "aspirational in character and represent the objectives toward which every member of the profession should strive." *Id*. DR's are mandatory and state "the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action." *Id.*

Pursuant to the Code as it was adopted in 1970,[20] "[e]xcept with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, personal interests." *Id*. at p. 37, DR 5-101(A). Pursuant to DR 5-105(B), "[a] lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5-105(C)." *Id*. at p. 39. Finally, DR 5-105(C) states that "a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each

---

[20] There were several Amendments to the Code after 1970, none of which have materially altered the provisions concerning conflicts of interest. *See New York Lawyer's Code of Professional Responsibility*, effective through Mar. 31, 2009, *available at* www.nysba.org.

and if each consents to the representation after full disclosure of the possible effect of such

representation on the exercise of his independent professional judgment on behalf of each." *Id.*

In addition to the DR's, EC 5-15 pertinently states:

> If a lawyer is requested to undertake or to continue representation of multiple clients having potentially differing interests, he must weigh carefully the possibility that his judgment may be impaired or his loyalty divided if he accepts or continues the employment. . . . A lawyer should never represent in litigation multiple clients with differing interests; and there are few situations in which the lawyer would be justified in representing in litigation multiple clients with potentially differing interests. . . . On the other hand, there are many instances in which a lawyer may properly serve multiple clients having potentially differing interests in matters not involving litigation. If the interests vary only slightly, it is generally likely that the lawyer will not be subjected to an adverse influence that he can retain his independent judgment on behalf of each client; and if the interests become differing, withdrawal is less likely to have a disruptive effect upon the causes of the clients.

*Id*. at pp. 33-34.

### b. Application of Ethical Standards

It is undisputed that portions of the approximately 100,000 and 300,000 acres of land for

which compensation was sought in the Test and Reservation Cases, respectively, was owned by

BSK attorneys, their family members, and their clients. Reply at p. 26. The claims presented in the

Test and Reservation Cases asserted that the Nation had a valid claim to title of the land. Shattuck

Decl. at ¶ 73 (stating that "this was an action to declare the Oneidas' rights to the land."). In that

respect, it is clear from the outset that the Nation's land interests were potentially adverse to those

of BSK's attorneys and some of its clients because of the Nation's essential claim of rightful

ownership. The Court rejects BSK's proposition that its remarkable victory in the Supreme Court

in the Test Case "created the potential for a conflict of interest." BSK's Mem. of Law at p. 8. The

victory certainly increased the possibility of recovery and opened the doors for other Native

American tribes to sue in federal court on the same or similar grounds, but it did not *create* any

*-26-*

potential conflicts.  The fact that the Nation sued only the State of New York and its subdivisions and sought only monetary damages does not change the basis upon which the suit was brought: the Nation's rightful ownership of the land.

However, because BSK agreed to sue only the State of New York and its subdivisions, it precluded the creation of a situation wherein it would be forced to directly sue its own attorneys, their family members, or its other clients.  As such, BSK did not have a "direct and substantial stake in the outcome of the litigation" and therefore was not "akin to that of a defendant," rather, its interests were indirect.  *Greene v. Greene*, 47 N.Y.2d 447, 452 (N.Y. 1979).  Were New York State to settle the claims or be found liable on them, BSK would have suffered no direct negative financial or other loss, and the same would have held for the family members of BSK's attorneys and BSK's landowning clients.  Thus, BSK created a unique situation in which the ends sought on behalf of the Nation (monetary recovery from the State of New York) did not create any potential ethical conflicts, but the legal means for obtaining such recovery (the Nation's establishment of its rightful ownership of the land) did.

The cornerstone of the attorney-client relationship, and the *raison d'etre* for Canon 6 and its counterpart DR 5-101(a)-(c) in the Code, is undivided loyalty on the part of the attorney on behalf of his client.  *See Kelly v. Greason*, 23 N.Y.2d 368, 375-76 (N.Y. 1968).  For that reason, Canon 6 requires full disclosure of "any interest in or connection with the controversy, which might influence the client's selection of counsel" at the time of retainer.  DR 5-101(A) states that if a lawyer's personal interests could affect his professional judgment, he cannot accept employment "[e]xcept with the consent of the client after full disclosure."

George Shattuck states in his Declaration that

> [f]rom the outset we made it clear to the Oneida representatives that Bond,
> Schoeneck & King could never sue private landowners because we were already
> representing many clients in the claims area on other legal matters. Our position did
> not prevent us from taking the Oneidas' "case" because the Oneidas had no intention
> of suing any private landowner to recover land.

Shattuck Decl. at ¶ 11.

Jacob Thompson, the President of the NY Oneidas at the time the Retainer Agreement was entered

into, swears in his Affidavit that BSK's limitations were made clear at a January 15, 1966 Meeting

held between the attorneys and members of the CAN, WI, and NY Oneidas where the terms of the

Retainer Agreement were agreed to:

> During the meeting George Shattuck explained that he lived on the disputed lands,
> as did another partner of BSK]. The [BSK] attorneys present indicated that they also
> represented other landowners, corporations, and business entities who owned
> property within the land claim area. It was made very clear to all of us present that
> BS&K could not sue individual or corporate landowners, and that if there came a
> time when the Oneidas wanted to bring these kinds of suits, BS&K would have to
> withdraw due to the conflict of interest that would be created.
>
> Mr. Shattuck also stated that his mother, Mrs. Shattuck, had a summer camp on
> Cazenovia Lake which was in the land claim area, and that the Shattuck family
> owned quite a bit of land in and around Cazenovia Lake, all of which we knew was
> within the land claim area. Mr. Shattuck emphasized that he could not sue
> landowners for ejectment because he would have to sue his own mother. We all
> understood from the beginning that, because [BSK] was a large law firm with many
> of its own attorneys and clients owning land in the land claim area, [BSK] could only
> sue for lands owned by New York State or the counties within the land claim.
>
> A proposed retainer agreement was presented to all the representatives from the three
> tribal entities of the Oneidas at the meeting. [BSK] went over the whole contract with
> all of us who were there. One of the items that was discussed and explained was that
> [BSK] was only authorized to represent the Oneidas in a lawsuit against the state and
> the counties, and not individual landowners. This was consistent with what my
> intentions had been in bringing a land claim. Right from the very beginning it was
> the intention of the Oneida Nation of NY not to sue individual landowners for
> ejectment but to seek monetary compensation for the illegal land transactions
> between the Oneida Indian Nation and the State of New York so we could buy the
> land back. This intention can be seen in the petitions I wrote to the State of New
> York and the US government, including the president of the US.

*-28-*

> As the president of the Oneida Indian Nation of New York, at many different nation meetings I always informed the members at meetings that [BSK] could not sue individual landowners for ejectment and that if we ever attempted to do this that we would have to retain another firm, which we did for the <u>Williams</u> case.

Thompson Aff. at ¶¶ 16-18, & 25 (emphasis in original).[21]

Shattuck's April 25, 1977 Letter to Thompson informing him of BSK's intent to withdraw refers to past discussions on the issue, stating: "[a]s you know from our discussions at the time of our retainer, we are unable to represent or advise you with respect to potential actions against the private landowners."  Smith Decl., Ex. 23, Lt., dated Apr. 25, 1977, at p. 3.

Notwithstanding Mr. Thompson's and Mr. Shattuck's sworn statements, the NY and WI Oneidas argue that BSK improperly failed to tell the Nation that they had a conflict and never obtained the Nation's consent or waiver as to that conflict.  Joint Opp'n at p. 19.  The NY and WI Oneidas point to minutes from the January 15, 1966 Meeting referenced by Thompson in his Affidavit that bear no mention of any conflicts or potential conflicts.  Smith Decl., Ex. 13, Minutes from Jan. 15, 1966 Meeting.  Those minutes are in the form of a report based on the transcription of one of the attendee's shorthand notes.  *Id*., Ex. 13, Leona E. Collins Decl., dated Aug. 5, 2002.  Beyond the silence of the minutes from the January 15, 1966 Meeting, there is nothing in the record contradictory to Shattuck's and Thompson's statements that BSK's limitations were well-known to the Nation at the time the Retainer Agreement was signed.  At a minimum, the Nation was put on notice that BSK would represent them only in claims against the State of New York by the terms

---

[21] The "Williams case" referred to in Paragraph 25 of Thompson's Affidavit is *Oneida Indian Nation of New York v. Williams, et al.*, 5:74-CV-167, a case currently pending before Judge Kahn in the Northern District of New York. In that case, which was filed in 1974, the NY Oneidas sued several private landowners, seeking a declaratory order affirming its right to possess and occupy certain lands located within Madison County, New York, and asking the court to "order the defendants to remove from such lands which the Oneida Indian Nation of New York is entitled to possess and occupy."  Test Case Dkt. No. 111, Hermes Fernandez Aff., dated Dec. 11, 2002, Ex. B, Compl., at ¶ 1.  On September 30, 2010, a Status Report was filed advising that the status of the matter had not changed, even though the Second Circuit had issued a Mandate directing a judgment for Defendants in the Reservation Case.  The Plaintiffs therein indicated that they intend to seek a petition for certiorari.  Civil Case 5:74-CV-167, Dkt. No. 106.

of the Retainer Agreement itself, which expressly limits the scope of BSK's representation to claims against the State of New York.  Retainer Agreement at ¶¶ 1 & 4 (specifying that BSK would represent the Nation "*against the State of New York* in respect of their former lands in New York State," and that payment was "contingent upon a recovery for the Nation *from the State of New York*, or any political sub-division or department of it") (emphases added).

Therefore, the record establishes the Nation's understanding as to the scope of BSK's representation and the ethical reasons for such limitation.  The NY and WI Oneidas rely on statements made by George Shattuck at his deposition that he never told the Nation that BSK had conflicts of interest.  Joint Opp'n at pp. 19-20 (citing Smith Decl., Ex. 11, Shattuck Dep., dated July 19, 2002 (hereinafter "Shattuck Dep."), at p. 37, stating "I don't think I would have said to them there was a conflict of interest.").  However, Shattuck's statements appear to reflect his legal opinion that there was no conflict of interest until around 1977, not that BSK never informed the Nation of its own interests and the interests of its other clients.  Indeed, Shattuck stated in the same deposition that he was sure that BSK had told the Nation prior to entering into the Retainer Agreement in 1967 that BSK could not and would not sue private landowners.  Shattuck Dep. at p. 44.

Moreover, as evidenced by their claims in *Oneida Indian Nation of New York v. Williams, et al.*, 5:74-CV-167 (N.D.N.Y.), the Nation knew that it was not legally prohibited from suing individuals for ejectment, and was not in any way prevented from so doing.  Jacob Thompson states that after the Supreme Court victory in the Test Case, he

> learned that there was additional acreage that could be involved in the land claim, and in talking to George I suggested that we could go after this property but that we would have to sue for ejectment.  George explained, as he had done many times before, that BS&K could not sue for ejectment and that we would have to get another law firm.  I asked George if he knew of a law firm that we could go to, and he thought we should talk to NARF in Colorado. . . . We signed a contract with NARF

*-30-*

to pursue this case.  In April 1974 NARF filed a case in ejectment in the United
States District Court entitled <u>Oneida Indian Nation v. Williams</u>.
Thompson Aff. at ¶ 24.

According to EC 5-3, as written in 1970, if the "self-interest of a lawyer resulting from his
ownership of property in which his client also has an interest" interferes with that lawyer's free
judgment, then he should decline such employment if proffered by a prospective client.  Code of
1970, at p. 30.  Furthermore,

> [e]ven if the property interests of a lawyer do not presently interfere with the exercise
> of his independent judgment, but the likelihood of interference can be reasonably
> foreseen by him, a lawyer should explain the situation to his client and should
> decline employment or withdraw *unless the client consents to the continuance of the
> relationship after full disclosure*.

*Id*. (emphasis added).

There is nothing in the record to suggest that BSK's independent judgment was impeached
due to the ownership of portions of the land in question by their attorneys, family members, and
other clients.  According to Thompson's Affidavit, he approached BSK with the intent to sue the
State of New York, not individual landowners.  Thompson Aff. at ¶ 18.  It is clear that for Shattuck,
irrespective of any ethical issues, suing the State of New York and not individual landowners was
the best strategy.  That strategy took into account the confluence of legal and political realities
facing Native-American plaintiffs at that time who sought redress for centuries-past injustices
relative to land ownership.  From Shattuck's perspective, politically speaking, a suit for ejectment
against private landowners was ill-advised because it could result in Congressional ratification of
the land purchases, leaving the Nation without recourse; legally speaking, a suit for ejectment was
ill-advised because the harsh consequences of the relief sought would overshadow and prejudice the
merits of their legal claim.  Shattuck Decl. at ¶ 128.  Thus, BSK argues that although they could not
have sued for ejectment because of the ethical conflicts such a suit would have created, nevertheless,

such a legal strategy was not likely to bear fruit, especially prior to the Supreme Court's ruling in the Test case.[22]

Although there were potential conflicts of interest from the outset, the evidence in the record supports BSK's assertion that it disclosed its own interests in the land and explained why it could not and would not sue individual landowners due to such conflicting interests, and that the Nation consented to BSK's stipulation that it would represent the Nation against the State of New York only. *See* Thompson Aff. at ¶¶ 16-17, & 25; Retainer Agreement at ¶¶ 1 & 4. In that respect, a lawyer may limit the scope of his or her representation of a client as long as the lawyer fully informs the client of the extent of the representation and the effects of the limitation on that representation. *See Campbell v. Fine, Olin & Anderson*, 642 N.Y.S.2d 819, 821 (N.Y. Sup. Ct. 1996) (citing New York State Bar Ass'n Comm. on Prof'l Ethics, Op. 664 (June 3, 1994); *see also Consol. Theatres v. Warner Bros. Circuit Mgmt. Corp.*, 216 F.2d at 927 (2d Cir. 1954) ("[A]n attorney's power of representation is confined to the matters which have been entrusted to him, in the absence of express authority for more general representation."); *see also* N.Y.C. ASSN. BAR COMM. PROF. JUD. ETHICS FORMAL OP. 2001-3, *Topic: Limiting the Scope of An Attorney's Representation to Avoid Client Conflicts,* 2001 WL 1870201, at *2 (July 6, 2001).

---

[22] It bears mentioning on that point that, to date, BSK's supposition that a claim for ejectment was not likely to succeed due to the consequences of granting such relief has been proven correct. In the Reservation Case, Judge McCurn denied the Nation's Motion to Amend to add private individual landowners as defendants, finding such claims to be futile as against private landowners. Reservation Case Dkt. No. 184, Order, dated Sept. 25, 2000, at pp. 49-66. Also, in a separate land claim brought by the Cayuga Indian Nation, the Second Circuit rejected that tribe's request for relief in the form of ejectment, holding that under the precedent established by the Supreme Court in *City of Sherrill v. Oneida Indian Nation of New York*, 544 U.S. 197 (2005), such a "disruptive" claim was subject to the equitable defense of laches. *Cayuga Indian Nation of New York v. Pataki*, 413 F.3d 266 (2d Cir.), *cert. denied* 126 S. Ct. 2022 (2006). Based on the Second Circuit's decision in *Cayuga*, Judge Kahn granted the Defendants' Motion for Summary Judgment in the Reservation Case as to the Nation's possessory land claim, holding that such claim was barred by the defense of laches, but that its non-possessory land claims were not. Reservation Case Dkt. No. 611, Mem.-Decision and Order, dated May 21, 2007; *Oneida Indian Nation of New York v. New York*, 500 F. Supp. 2d 128 (N.D.N.Y. 2007). And, based upon the Second Circuit's Mandate, the case was dismissed and a judgment in favor of the Defendants was entered on January 10, 2011. Reservation Case Dkt. No. 623.

Therefore, the Court finds that since BSK and the Nation agreed that suit would only be brought against the State of New York and its political subdivisions, BSK's independent professional judgment was not "likely to be adversely affected" by its representation of other clients on unrelated matters.  Model Code of 1970, DR 5-105(B).  Furthermore, the limitation of BSK's representation meant it was not BSK's "duty to contend for that which duty to another client require[d them] to oppose."  Canon 6 of the Canons of Professional Ethics.  As such, the Court finds that BSK did not violate ethical standards by entering into the Retainer Agreement with the Nation.[23]

The NY and WI Oneidas also argue that BSK failed to inform the Secretary of the Interior about its conflicts, and therefore the contract should be declared void under 25 U.S.C. § 81.  Joint Opp'n at p. 20.  At his deposition, George Shattuck stated that he did not recall if BSK had informed the Secretary of the Interior that BSK did not intend to sue private landowners.  Shattuck Dep. at p. 110.  There is simply no evidence in the record speaking to whether or not the Secretary of the Interior was aware of BSK's potential conflicts, nor is there any legal precedent cited to, and the Court can find none, suggesting that disclosure of such information is required under 25 U.S.C. § 81.  In any event, the Retainer Agreement itself specifically limited BSK's representative obligations to claims against the State of New York, and it was approved with that limitation intact by the Secretary of the Interior.  The Court therefore finds that there is no factual nor legal basis to support the NY and WI Oneidas' argument that the Retainer Agreement should be voided as a contract pursuant to 25 U.S.C. § 81.

---

[23] A separate question exists as to whether BSK violated its obligations to its other clients whose property rights were implicated by the legal theories propounded by BSK on behalf of the Nation.  None of those clients are parties to this action, and none have a direct interest in the outcome of the present Motion.  Therefore, we need not consider whether BSK violated any of its ethical obligations to those clients; our concern is limited to whether BSK's representation of those clients affected its ability to render independent judgment on behalf of the Nation.

Finally, the NY and WI Oneidas suggest in passing that BSK violated ethical standards by representing the NY, CAN, and WI Oneidas concurrently in the same action. Joint Opp'n at pp. 18-19. The argument is fleshed out slightly more in Professor Wolfram's Declaration,[24] where he states that BSK should have foreseen potential conflicts between the different Oneida groups given their diverse geographic locations and the fact that any award would have to be allocated amongst the three groups. Reservation Case Dkt. No. 474, Charles W. Wolfram Decl., dated Aug. 7, 2002, at ¶¶ 28-29.

Canon 6 of the Canons of Professional Ethics states that "it is unprofessional to represent conflicting interests, except by express consent of all concerned given after a full disclosure of the facts." DR 5-105(C) states that "a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each." *Id.*

There is no evidence in the record that, at the time the Retainer Agreement was entered into, any conflicting interests existed between the NY, WI, and CAN Oneidas. All three groups had the

---

[24] BSK and the NY and WI Oneidas have each submitted a sworn statement by an expert in support of their respective positions. The NY and WI Oneidas have submitted the Declaration of Charles Wolfram, Professor of Ethics at Cornell Law School, while BSK offers the Affidavit of Lester Brickman, Professor of Ethics at the Benjamin N. Cardozo School of Law. Wolfram Decl. at ¶ 4; Test Case Dkt. No. 61, Lester Brickman, Esq., Aff., dated Sept. 23, 1999, at ¶ 2. Each sworn statement has attached to it several Exhibits. In its Reply, BSK urges the Court to strike the Declarations of Professor Wolfram and Michael R. Smith, one of the NY Oneidas' attorneys, because they contain legal arguments and conclusions and are therefore in violation of Local Rule 7.1(a)(2), which states that "an Affidavit must not contain legal arguments, but must contain factual and procedural background as appropriate for the motion being heard." Reply at pp. 21-22. Such legal conclusions are peppered throughout the sworn statements submitted by the NY and WI Oneidas. *See, e.g.*,Wolfram Decl. at ¶¶ 15 & 27 (concluding that BSK "had a conflict of interest" and that BSK "violated fundamental rules of conflicts of interest") & Smith Decl. at ¶ 16 (stating "[f]rom the inception, BSK had substantial conflicts of interest"). However, BSK also transgresses the rule. *See* Brickman Aff. at ¶ 22 (stating "the conflict of interest that arose here did not reflect any transgression of the Code of Professional Responsibility by BS&K"). Such legal conclusions are improper and will be disregarded on both sides. *Federated Mut. Ins. Co. v. Woodstock '99, LLC*, 190 F. Supp. 2d 324, 328 n.2 (N.D.N.Y. 2002) (citing N.D.N.Y.L.R. 7.1(a)(2)).

same interest in procuring monetary compensation from New York State, and also had the same legal basis for their joint claims because at the time the property traded hands in the Eighteenth Century, all three groups were part of the singular Oneida Nation.  The record shows that upon approaching BSK, Jacob Thompson made clear that the claim would be brought on behalf of all three tribes.  Thompson Aff. at ¶ 15.  Thereafter, BSK procured the consent of all three tribes to the joint representation.  *See* Retainer Agreement.  The minutes from the January 15, 1966 Meeting include discussions about the basis for the WI and CAN Oneidas' claims, and their right to a portion of the recovery based on the fact that the improper sales of the land occurred prior to their migration from New York.  Smith Decl., Ex. 13, Minutes, at pp. 13-14.  The fact that any recovery would necessarily have to be split between the three tribes did not constitute a conflict of interest.

In sum, even under the standards of DR 5-105(A) & (C) of the Model Code, which had not yet been adopted at the time the Retainer Agreement was entered into in 1967, there was no conflict of interest between the three Oneida groups, and furthermore, it was obvious that BSK could adequately represent the interests of each because their claims and interests were identical, not inimical.[25]  Indeed, even in a situation where potential conflicting interests existed between two Native American tribes, as they did in *Oneida of Thames Band v. State of New York*, 757 F.2d 19, 22 (2d Cir. 1985), the Second Circuit held that both tribes could be properly represented by the same attorney with the tribes' consent under DR 5-105(C).  Therefore, this claim is without merit.

### 2. *BSK's Withdrawal*

The NY and WI Oneidas argue that BSK withdrew without just cause because its conflicts of interest were foreseeable and because its reason for withdrawal was its perceived "diminishing

---

[25] The fact that these three tribes continued to collectively prosecute their land claims clearly indicates that no conflict exists.

returns" on the case.  Joint Opp'n at p. 19.  "Just cause" for withdrawal is a requirement for the payment of fees pursuant to an attorney's lien under New York Judiciary Law § 475.  *See, e.g., Klein v. Eubank*, 87 N.Y.2d 459, 462-63 (N.Y. 1996) (stating "a charging lien is waived by an attorney *who without just cause* neglects or refuses to proceed with the prosecution of the case") (emphasis in original) (citations omitted).  However, "it has long been the law in New York that an attorney's compensation 'is governed by agreement, express or implied, which is not restrained by law.'" *Diamond D Constr. Corp. v. New York State Dep't of Labor*, 2004 WL 1877720, at *13 (W.D.N.Y. Aug. 20, 2004) (quoting *Peri v. New York Cent. & H.R.R. Co.*, 46 N.E. 849, 850 (N.Y. 1897)). There is nothing in the Retainer Agreement that requires a showing of just cause for withdrawal in order for attorney's fees to be awarded.  Rather, Paragraph 10 states that equitable attorney's fees, as determined by the Court, shall be forthcoming unless the contract is terminated due to "the wrongdoing or dereliction of the attorneys."

The DOI required the substitution of the aforementioned language in Paragraph 10 as a precondition to its approval of the contract under 25 U.S.C. § 81.  The original version of the Retainer Agreement submitted to the DOI stated:

> This contract may be terminated by the Secretary of the Interior or his authorized representative with the consent of the Nation for unethical conduct on the part of the Attorneys upon 60 days' notice to the parties in interest.  This contract also may be terminated by the Attorneys on 60 days' notice to the Nation and to the Secretary of the Interior if in the opinion of the Attorneys the facts do not warrant commitment of any more of the Attorneys' time and efforts to attempt to obtain such recovery.

Shattuck Decl., Ex. 1, Original Retainer Agreement at ¶ 10.

The approved version of Paragraph 10 deleted the proposed circumstances under which the contract could be terminated, *i.e.*, unethical conduct on the part of the attorneys or the attorneys' opinion that the claims were without merit, and added language allowing BSK and Secretary of the Interior to

terminate the contract without precondition and upon sixty (60) days notice, and giving the Nation the same right provided it obtained approval from the Secretary of the Interior. The Secretary of the Interior stated in a letter to George Shattuck that the language he required to be substituted in Paragraph 10 was generally used to provide for the termination of attorneys in Indian land claim actions. Test Case Dkt. No. 61, Lester Brickman Aff., dated Sept. 23, 1999, Ex. 12, Lt. from DOI to Shattuck, dated Mar. 28, 1967.

Thus, Paragraph 10 of the Retainer Agreement specifies the terms under which attorney's fees shall be determined after a premature termination of the contract has occurred and therefore, the Court need not consider whether BSK is owed attorney fees pursuant to New York Judiciary Law § 475 nor whether "just cause" existed for BSK's withdrawal. *See McNammee, Lochner, Titus & Williams, P.C. v. Higher Educ. Assistance Found.*, 50 F.3d 120, 124-25 (2d Cir. 1995) (holding that attorneys were not entitled to fees in [*q*]*uantum meruit* pursuant to a charging lien because the express terms of the contract controlled the amount of fees due) (citing *Jontow v. Jontow*, 310 N.Y.S.2d 145, 146-47 (N.Y. App. Div. 1st Dep't 1970) ("Where there is an express contract for compensation an action will not lie for quantum meruit. . . . And this principle is applicable to the awarding of attorney's fees.")). The pertinent question is whether BSK engaged in "wrongdoing," so as to forfeit its fees under the terms of Paragraph 10, not whether or not they withdrew for just cause.

Paragraph 10 stipulates that attorney's fees will be barred if the Retainer Agreement is terminated as a consequence of the attorney's "wrongdoing." Paragraph 10 parallels the rule in New York that attorneys forfeit their right to fees if discharged for cause. *Budin, Reisman, Kupferberg & Berstein, LLP v. Law Office of Rosemarie Arnold*, 79 Fed. Appx. 460 (2d Cir. 2003) (unpublished

opinion) (citing *Schwartz v. Tenenbaum*, 182 N.Y.S.2d 51 (1959)).  Cause "is shown by impropriety or misconduct on the part of the attorney."  *Garcia v. Teitler*, 443 F.3d 202, 212 (2d Cir. 2006) (citing *Klein v. Eubank*, 87 N.Y.2d at 463).

In this case, the record shows that BSK withdrew from representation and that the Nation consented to their withdrawal.  There is no suggestion that the Nation discharged BSK, for cause or otherwise.  *Cf. id.* at 212 (finding forfeiture of attorney's fees was appropriate where record showed that the client discharged the attorney for cause).  The New York Court of Appeals has rejected the proposition that attorney's fees are forfeited in the "myriad of cases in which the attorney's representation is discontinued by mutual consent for reasons not rising to the level of misconduct or 'just cause' on either side."  *Klein v. Eubank*, 87 N.Y.2d at 462.  Under New York law, "[w]here an attorney's representation terminates upon mutual consent, and there has been no misconduct, no discharge for just cause, and no unjustified abandonment by the attorney, the attorney maintains" his right to a fee.  *Lansky v. Easow*, 756 N.Y.S.2d 885, 885-86 (N.Y. App. Div. 2nd Dep't 2003).

The NY and WI Oneidas argue that BSK's entering into the Retainer Agreement despite the conflicts of interest that existed constituted wrongdoing under Paragraph 10 because BSK's conflicts were foreseeable and their withdrawal was therefore without just cause.  However, we have already held that BSK did not violate any ethical obligations to the Nation by entering into the Retainer Agreement.  Therefore, that claim is without merit.

The NY and WI Oneidas also argue that BSK engaged in wrongdoing because it withdrew due to its own perception that the cases had reached a point of "diminishing returns."  The NY and WI Oneidas point to a 1977 Memorandum from George Shattuck to BSK's Executive Committee

*-38-*

wherein he states:

> Apart from conflicts, and apart from having succeeded in getting the U.S. to act, I think this is a good time [for BSK] to 'bow out' for the following reasons: (1) I think we have reached a point of diminishing returns in terms of time spent . . . (4) Internal dissensions in the Oneidas are sure to complicate things and possibly make enemies for us from now on.

Smith Decl., Ex. 22, Mem., dated Apr. 13, 1997 at p. 1.

The NY and WI Oneidas argue that the above Memorandum is proof that BSK withdrew because of its perceived diminishing returns, not because of ethical considerations.  However, even assuming that the sole reason for BSK's withdrawal was its perception of diminishing returns, Paragraph 10 of the Retainer Agreement gave BSK the option to withdraw from the case, without precondition, upon sixty (60) days written notice at any time.  The Nation had the same right to terminate the contract for any reason if it obtained the consent of the Secretary of the Interior.  Thus, BSK's exercise of its option to terminate the contract provided in Paragraph 10 cannot be considered wrongdoing under the terms of that same paragraph; such an interpretation would mean that the contract penalizes that which it specifically permits.  In that respect, under New York law, "[a] party has an absolute, unqualified right to terminate a contract on notice pursuant to an unconditional termination clause without court inquiry into whether the termination was activated by an ulterior motive."  *Big Apple Car, Inc. v. City of New York*, 204 A.D.2d 109, 111 (N.Y. App. Div. 1st Dep't 1994) (cited in *Ixe Banco, S.A. v. MBNA Am. Bank*, N.A., 2008 WL 650403, at *7 (S.D.N.Y. Mar. 7, 2008)).

Therefore, we conclude that BSK did not engage in wrongdoing by its withdrawal and termination of the contract, and fees should not be denied on that basis.

### 3. *BSK Prevented the Nation from Seeking Other Attorneys*

The NY and WI Oneidas' final claim of wrongdoing is that before the termination of the

Retainer Agreement in 1978, BSK prevented the Nation from seeking other counsel who did not have interests in the land in question.  Joint Opp'n at pp. 16-17.  The sole basis for this claim is a 1965 Memorandum written by BSK attorney R.E. Wildridge, Esq., in which he summarizes a discussion he had with members of the Oneida Nation at a meeting on July 10, 1965.  Smith Decl., Ex. 2, Mem., dated July 12, 1965.  In the Memorandum, Wildridge wrote that Jacob Thompson asked him to attend the meeting in order to explain to Nation members why BSK had decided to take the case.  *Id.* at p. 1.  Wildridge also wrote that he "urged that those present [at the meeting] reveal to no one outside the Tribe that we had agreed to represent it, lest the State learn in advance of our activity, and *speaking selfishly, lest other attorneys try to take advantage of the work we already have done and preempt the case from us.*"  *Id.* at p. 2 (emphasis added).

From that single italicized statement, the NY and WI Oneidas jump to the conclusion that BSK improperly "kept other lawyers away" from the Nation.  There is no evidence in the record to support such a claim.  At the time of the meeting referenced in Wildridge's Memorandum, BSK had already decided to take the case, though a retainer agreement had not yet been approved or signed.  According to Jacob Thompson, prior to contacting BSK, he contacted several law firms in the greater Syracuse, New York area regarding representation for the Nation on their land claims, however, most "stated they were too small to take on a case of this magnitude, particularly since the Oneida Nation had no ability to pay hourly rates for the enormous work which would be involved." Thompson Aff. at ¶ 11.

After Thompson contacted BSK, Shattuck was assigned to research the merits of the claims so that the firm's executive committee could decide whether or not to take the case.  Shattuck Decl. at ¶¶ 7-9.  After completing the research, Shattuck and Wildridge concluded that the Nation's claims

had merit and recommended that BSK take the case. Smith Decl., Ex. 1, Mem. from Shattuck & Wildridge, dated May 24, 1965. That Wildridge did not want another firm to usurp BSK's representation, especially given the research BSK did prior to the execution of the Retainer Agreement, does not constitute an ethical violation. In that respect, the NY and WI Oneidas cite to no legal authority in support of their claim. Finally, besides the aforementioned Memorandum, there is no evidence in the record to support the notion that BSK kept other attorneys away from the Nation.

Therefore, the Court finds that this claim is without merit and that BSK did not violate any ethical standards prior to or as a consequence of its termination of the Retainer Agreement in 1978.

## B. The NY Oneidas' Post-1978 Ethical Claims

The NY Oneidas allege that BSK violated its professional ethical duty of loyalty in the years following BSK's withdrawal by: (1) seeking to re-enter the Reservation Case in 1990 as counsel for the WI or CAN Oneidas, but not the NY Oneidas; and (2) advising the CAN Oneidas to join a lawsuit against the NY Oneidas in order to close down Turning Stone Casino in New York. Test Case Dkt. 108, Separate Opp'n, at pp. 2-3 & 6.

### 1. *Findings of Fact*

Throughout the 1980's, the three Oneida tribes were engaged collectively in settlement negotiations with the State of New York. In a letter, dated April 21, 1986, George Shattuck confirmed to the CAN Oneidas that he "would be delighted to represent [them] . . . in negotiations with the State." Smith Decl., Ex. 33, Lt., dated Apr. 21, 1986. In that letter, Shattuck stated that prior to his participation, the "three branches of the Oneidas would have to agree as to the division of the settlement proceeds." *Id.* Shattuck went on to state that he "could not represent the Oneidas

of the Thames against the others, nor could [he] represent them against [the CAN Oneidas]." *Id.*
In a July 11, 1986 Letter to Mr. Arnold Antone of the CAN Oneidas, Shattuck reiterated his offer
"to be a member of the negotiating team *on behalf of all three branches of the Oneidas*." *Id.*, Lt.,
dated July 11, 1986 (emphasis added).

In a January 15, 1990 Letter to Mr. Richard Hill of the WI Oneidas, Shattuck wrote about
the conclusions reached during a previous meeting, stating that BSK was "a valuable resource which
the Oneidas have not used," and affirming his desire "to be part of the team, as a representative for
the Wisconsin and Canadian Oneidas." Smith Decl., Ex. 37, Lt., dated Jan. 15, 1990. Shattuck
acknowledged that "[t]here are certainly some areas of conflict of interest remaining, but I would
not be the only counsel nor the lead counsel." *Id.* Shattuck concluded candidly: "To be frank, I
have devoted a lot of time, effort and creativity to the Oneida claim and it is very difficult for me
to sit on the sidelines and watch things drag along." *Id.*

On April 4, 1991, the collective Nation submitted a settlement proposal to the State of New
York. Test Case Dkt. No. 111, Hermes Fernandez, Esq., Aff., dated Dec. 11, 2002, Ex. F, Fax from
D.O. Brownwood, dated Feb. 4, 1992 at p. 2 (noting that the settlement proposal was submitted by
all three tribes). The State responded on or about January 31, 1992, implying that it would negotiate
only with the NY Oneidas. That response was forwarded from the NY Oneidas' counsel, David O.
Brownwood, Esq., to BSK. *Id.* at p. 1. Upon learning of the State's position, George Shattuck
attempted to impress upon the WI and CA Oneidas that the State's position could jeopardize their
interests in a potential settlement. Smith Decl., Exs. 36, 38, & 41. In a March 9, 1992
Memorandum to John M. Meyer, Esq., another BSK attorney, Shattuck stated:

> About 10 days ago you suggested that I call the clients['] attention to the fact that
> New York State said it would only deal with the New York Oneidas. I placed three

> calls to Loretta Metoxin on February 28 and March 2, 1992 and she did not return
> any of the three calls.  I also called Arlinda Locklear on March 4 and she did not
> return my call.  I called Ray George of [CAN] on March 2nd and called his attention
> to the statement on page 14 of the state's response.  He said he had read this and
> other people had asked him about it.  He said it was not a matter of concern to him.

*Id.*, Ex. 36, Lt., dated Mar. 9, 1992.

Shattuck concluded: "I don't know what more I can do here but I do have the feeling that the

Oneidas of CAN and WI are not being well represented." *Id.*

Despite Shattuck's overtures, BSK was not retained by either the CAN or WI Oneidas at that

point.  *Id*., Ex. 38, Mem., dated Apr. 27, 1992 at p. 3.  In an April 27, 1992 Memorandum to the WI

Oneidas, Shattuck lamented New York's position that it would deal only with the NY Oneidas.  *Id*.

at pp. 4-5.  In a subsequent Memorandum to both the WI and CAN Oneidas, Shattuck stated:

"Bond, Schoeneck & King has always represented all three groups, and indeed all Oneidas whether

living with the groups or not.  We feel a very strong sense of duty to the New York Oneidas, but not

at the expense of the other groups." *Id*., Ex. 41, Mem., dated May 17, 1992 at p. 2.

Following a meeting between Shattuck and representatives from the CAN and WI Oneidas

in 1992, Shattuck wrote a letter in which he stated that BSK could represent the CAN and WI

Oneidas as litigation counsel only if BSK "would in no way be requested to act adversely to the New

York Oneidas." *Id*., Ex. 42, Lt., dated May 27, 1992 at p. 5.  In that same letter, Shattuck

recommended that the CAN and WI Oneidas ask the NY Oneidas to repudiate New York's position

that it would only deal with them, and that if the NY Oneidas' response was negative, that they

"break[] off negotiations" and prepare to litigate.  *Id*. at pp. 1-2.  However, a few months later,

Shattuck wrote a letter to the WI Oneidas stating that due to "perception about conflicts of interest,

and related concerns," BSK would not act as their litigation counsel.  *Id*., Ex. 60, Lt., dated Sept. 1,

1992.

*-43-*

On February 8, 1993, the NY Oneidas sent a letter to the WI Oneidas explaining that they had "made the difficult decision to suspend its efforts to negotiate resolution of its land claims jointly with the Oneidas from Wisconsin and Canada," and "negotiate a settlement separately with the State of New York." *Id.*, Ex. 49, Lt., dated Feb. 8, 1993, at pp. 1 & 3.

On July 19, 1993, several members of the NY Oneidas filed an action in federal court seeking a permanent injunction against the operation of the Turning Stone Casino in New York. *Homer v. Halbritter*, 158 F.R.D. 236, 236 (N.D.N.Y. 1994); *see also* Smith Decl., Ex. 45, Compl., dated July 19, 1993. The plaintiffs in that action were represented by Bertram E. Hirsch, Esq. *Id.* During the summer of 1993, BSK and the CAN Oneidas were communicating about the possibility of entering into a new retainer agreement. In a letter to the CAN Oneidas dated July 23, 1993, Shattuck wrote that under the general terms of the retainer agreement BSK was proposing, BSK would "cooperate with other counsel of the Oneidas, including Arlinda Locklear and Bert Hirsch." *Id.*, Ex. 44, Lt., dated July 23, 1993, at ¶ 5. Shattuck also wrote that if a new retainer agreement was entered into, BSK "would not represent [the CAN Oneidas] regarding a division of any settlement proceeds with the other Oneida groups" and that they "would both have to remain aware that Bond, Schoeneck & King have also represented the other two groups on the claims and could not do anything inconsistent with their interests." *Id.*, Ex. 44, Lt., dated July 23, 1993, at ¶¶ 4 & 6(c).

BSK and the CAN Oneidas entered into a Retainer Agreement in the Fall of 1993. *Id.*, Ex. 52, Lt., dated Oct. 15, 1993 (stating that BSK's Executive Committee had approved the contract) & Retainer Agreement Draft, dated Nov. 2, 1993. However, prior to the execution of the contract, Shattuck wrote a letter to Alfred Day of the CAN Oneidas on August 2, 1993, with the caption "Action to Remove Management from Casino," in which he wrote: "I am writing this personal letter

of suggestions to you since my firm does not have a retainer contract and I do not wish to render legal advice without that.  However I certainly will be happy to give you suggestions and counsel of my personal views as you request them."  *Id.*, Ex. 47, Lt., dated Aug. 2, 1993, at p. 1.  Shattuck went on to list the pros and cons of joining the lawsuit against the management of Turning Stone Casino, writing that "[t]he first advantage is establishing once and for all that the Oneidas of the Thames and the Oneidas of Wisconsin have legal interests in the land on which the Casino is located and also in the operation of the Casino and its profits, if any."  *Id.* at p. 2.  Shattuck concluded: "My overall thinking is that it is advisable for your group to enter into the litigation."  *Id.* at p. 3.

On July 15, 1994, Ray Halbritter, Nation Representative for the NY Oneidas, sent a letter to George Shattuck stating:

> It has recently come to my attention that the Thames Band of Oneida Indians seeks to retain you to represent the Band in the Oneida land claims.  I write to you to let you know that, as your former client, the Oneida Indian Nation of New York objects to your representation of another plaintiff.
>
> * * * *
>
> [T]he Thames Band sides with the Oneida Tribe of Wisconsin to argue for a land base in New York that is not controlled by the Oneida Indian Nation of New York.  Accordingly, were you to represent the Band, you would be forced to take positions inconsistent with ours.  That would be inappropriate.

*Id.*, Ex. 54, Lt., dated July 15, 1994.

Shortly thereafter, Shattuck responded to the letter, stating that BSK was acting as legal consultant to the CAN Oneidas and would not be representing them in any litigation concerning disputes between the Oneida branches.  Shattuck stated:

> We recognize that we may not give advice of counsel adverse to the Oneida Indian Nation of New York or the Oneida Nation of Indians of Wisconsin.  However, we believe our involvement would benefit all Oneidas.
>
> Your concern about the firm having confidential information that could be used to

the detriment of the New York Oneidas is misplaced.  We have not represented the New York Oneidas for almost twenty years and have not acquired from them any information in that period of time and I am not aware of any confidential information in our possession that would be useful in any dispute among the Oneida branches concerning a land base in New York that is not controlled by the Oneida Indian Nation of New York.

*Id.*, Ex. 55, Lt., dated July 26, 1994 at p. 1.

## 2. *Application of Ethical Standards*

The Code of Professional Responsibility was adopted in New York State in 1970 and remained in effect until April 1, 2009, when New York's adoption of the Model Rules of Professional Conduct went into force.  Canon 5 states "[a] lawyer should exercise independent professional judgment on behalf of a client."  DR 5-108(A) states, in pertinent part: "a lawyer who has represented a client in a matter shall not, without the consent of the former client after full disclosure . . .[t]hereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client" nor "[u]se any confidences or secrets of the former client."  N.Y. COMP. CODES R. & REGS. tit. 22, § 1200.27 (repealed Jan. 7, 2009).  The American Bar Association's (ABA) Model Rule 1.9(a) of Professional Conduct has similar language to that of DR 5-108, though it requires the client's consent to be confirmed in writing.  MODEL RULES OF PROF'L CONDUCT R. 1.9 (2007).[26]  Lastly, Canon 9 dictates that "[a] lawyer should avoid even the appearance of professional impropriety."

In this case, the NY Oneidas do not allege that BSK used any secrets or confidences during the course of its representation of the CAN Oneidas, rather, the NY Oneidas' claim is one of general disloyalty and representation of interests adverse to their own.

---

[26] New York Rule of Professional Conduct 1.9(b) states: "Unless the former client gives informed consent, confirmed in writing, a lawyer shall not knowingly represent a person in the same or substantially related matter" when that person's interests are "materially adverse" to those of the former client.

Throughout the 1980's, the three Oneida tribes were engaged collectively in settlement negotiations with the State of New York.  However, in 1991, New York State implied that it would thereafter only deal with the NY Oneidas.  Upon learning of the State's position, George Shattuck attempted to impress upon the WI and CAN Oneidas that the State's position could jeopardize their interests in a potential settlement.  Smith Decl., Exs. 36, 38, & 41.  Subsequently, the NY Oneidas made clear to the WI and CAN Oneidas that they intended to engage in negotiations with the State separately in order to procure a favorable settlement for themselves.  *Id*., Ex. 49.  The NY Oneidas' letter to the WI Oneidas cementing their intent to deal individually with the State references fissures between the tribes on a variety of issues, including "cash division, control of land in New York, . . . repatriation," and allegations that the WI Oneidas met with politicians regarding the land claims without prior consultation of the NY Oneidas and "took those occasions to criticize the decisions [of the NY Oneidas'] leaders" and "accuse [the NY Oneidas] of attempting to use gaming economic development to bargain away elements of the land claims."  *Id*. at pp. 1-2.

Despite the divisions between the Oneida tribes, BSK executed a Retainer Agreement with the CAN Oneidas, pledging to represent the CAN Oneidas with respect to their land claims against the State of New York.  In that Retainer Agreement, BSK inserted the following limitations on their representation:

> We will at your request represent you in stating and presenting your position on issues in discussions with the other Oneida groups if their counsel is also present. However we may do nothing inconsistent with our representation of such other groups pursuant to our 1966 Retainer Agreement[.]
>
> * * * *
>
> We will not appear as your counsel in litigation without a further retainer agreement.
>
> We will not represent you regarding a division of any settlement with the other Oneida groups.  We regard this as inconsistent with our representing them on the

-47-

Land Claims.

*   *   *   *

As in the past we shall continue, when asked, to consult with, advise, and assist all
our clients under the 1966 Agreement to further their Land Claims, even though the
1966 Agreement, as extended, expired according to its terms in 1982.

Smith Decl., Ex. 30, Retainer Agreement, dated Nov. 2, 1993.

These aforementioned provisions evince BSK's attempt to walk across an ethical tight-rope:
BSK obligated itself to represent the interests of the CAN Oneidas, but it could do so only to the
extent those interests did not conflict with the interests of the other tribes.  However, given the NY
Oneidas go-it-alone stance at that point, no one representative would have been in a position to
protect the interests of all three tribes simultaneously.   Essentially, the NY Oneidas found
themselves in a superior bargaining position that served to undermine the respective positions of the
other tribes.  Shattuck recognized the disparate positions of the tribes when he stated, "[w]e feel a
very strong sense of duty to the New York Oneidas, but not at the expense of the other groups." *Id*.,
Ex. 41, Mem. at p. 2.  Clearly, if BSK's duty to the NY Oneidas could come at the expense of the
other tribes, the three tribes' interests were not completely congruent.

Complicating matters further was an apparent power struggle for leadership control within
the NY Oneida tribe, which manifested into the lawsuit brought against NY Oneida Representative
Ray Halbritter concerning the management of Turning Stone Casino.  Several members of the NY
Oneidas

claimed that [Ray] Halbritter had bypassed the Oneida Nation's tribal governance
procedures in securing a management contract for [Turning Stone] casino. . . . The
issues plaintiffs presented for decision apparently mirrored an ongoing intra-Oneida
political dispute as to whether plaintiff Homer or defendant Halbritter was the
recognized Nation Representative of the Oneida Nation.

*Homer v. Halbritter,* 158 F.R.D. at 237.[27]

Shattuck opined in a letter that by joining the claim against Halbritter, the CAN Oneidas could "[establish] once and for all" their "legal interests in the land on which the Casino is located and also in the operation of the Casino and its profits" while "demonstrat[ing] a sense of unity with the current leadership of the Oneidas of New York."  Smith Decl., Ex. 47, Lt. at p. 2.  Shattuck's recommendation highlights the WI and CAN Oneidas' apparent interests in and control over Oneida lands in New York, as well as the internal division within the NY Oneidas.  *See also, id.*, Ex. 49 at p. 1 (identifying possession and control of land in New York State as an issue between the NY and WI Oneidas).  The NY Oneidas point to Shattuck's recommendation to the CAN Oneidas that they join the lawsuit as an example of BSK's disloyalty.  Sep. Opp'n at pp. 6-7.

In support of their claim that BSK violated its duty of loyalty, the NY Oneidas cite to *In re Corn Derivatives Antitrust Litig.*, 748 F.2d 157 (3d Cir. 1984).  In that case, the Third Circuit Court of Appeals granted a motion to disqualify an attorney who had formerly represented several plaintiffs in a class action and withdrew from representing certain client-plaintiffs who approved a settlement, and then sought to represent a single client-plaintiff who objected to the settlement on appeal.  748 F.2d at 162.  In describing an attorney's duty of loyalty to a client, the Third Circuit stated, "[i]n litigation, an attorney may not abandon his client and take [an] adverse position in the same case.  This is not merely a matter of revealing or using the client's confidences and secrets, but of a duty of continuing loyalty to the client."  *Id.* at 161.

The factual scenario before us is distinguishable from that presented in *In re Corn*

---

[27] The plaintiffs in that action eventually voluntarily dismissed their claims, however, Mr. Halbritter filed a motion for sanctions pursuant to Fed. R. Civ. P. 11, which was met with a cross-motion for sanctions from the plaintiffs. The quoted text is from the decision by the Honorable Frederick J. Scullin, now-Senior District Court Judge for the Northern District of New York, denying both motions.  *Homer v. Halbritter*, 158 F.R.D. 236 (N.D.N.Y. 1994).

*Derivatives Antitrust Litig.*  In that case, the attorney was forced to advocate a position directly adverse to that of his former clients because his client opposed a settlement that his former clients approved.  Here, although the unity of the tribes had broken down, BSK was not forced to advocate directly against the NY Oneidas on the land claim because all three tribes still held the same legal claim against the State.  To date, all three tribes maintain their common land claim against the State of New York.  Thus, this was not an example of "professional apostasy," such as when a lawyer "switches sides" and represents the former client's adversary in the same matter, as would have been the case had BSK undertook to represent New York State or its subdivisions in the same or a related matter.  *In re I successor Corp.*, 321 B.R. 640, 650 (S.D.N.Y. 2005).  In this instance, BSK sought to re-enter the land claim game with the same team as before, but this time coaching only one of its players.

Nonetheless, BSK had a duty of loyalty to all three tribes owing to its 1967 Retainer Agreement.  The attorney-client relationship between BSK and the Nation was terminated along with the Retainer Agreement as a consequence of BSK's withdrawal in 1978.  *Rafter v. Liddle*, 2006 WL 2255093, at *8 (S.D.N.Y. Aug. 4, 2006) (citing *Shumsky v. Eisenstein*, 96 N.Y.2d 164, 170-71 (N.Y. 2001)).  But, a lawyer's duty of loyalty does "not necessarily end when the attorney-client relationship ends."  *In Re Agent Orange Prod. Liab. Litig.*, 800 F.2d 14, 17 (2d Cir. 1986) (citations omitted); *see also Arifi v. de Transport du Cocher, Inc.*, 290 F. Supp. 2d 344, 348 (E.D.N.Y. 2003).  The Court affirms that the expectation of loyalty is worthy of protection, *Rosman v. Shaprio*, 653 F. Supp. 1441, 1446 (S.D.N.Y. 1987), and that "[a]s a matter of professional responsibility, an attorney owes a duty to his client . . . not to accept representation of a person whose interests are opposed to the client," *Ehrich v. Binghamton City Sch. Dist.*, 210 F.R.D. 17, 23 (N.D.N.Y. 2002)

(internal quotation marks and citation omitted).  *See In re I successor Corp.*, 321 B.R. at 649 (affirming that attorneys owe a duty of loyalty to former clients which is separate and distinct from the duty to preserve client confidences).  Indeed, Comment 1 to ABA Model Rule 1.7 states that "[l]oyalty is an essential element in a lawyer's relationship to a client."  MODEL RULES OF PROF'L CONDUCT R. 1.7 CMT. 1 (2007).

Considering the divisions and conflicting interests among three Oneida tribes, it is the Court's conclusion that BSK's representation of the CAN Oneidas violated the duty of loyalty it owed to the NY Oneidas.  Particularly, with respect to settlement negotiations with the State, the interests of the tribes were adverse at the time BSK began its representation of the CAN Oneidas. Had BSK procured the NY Oneidas' consent, they might have properly represented the CAN Oneidas in their land claims.  *See* DR 5-108(A).  In a letter to the CAN Oneidas pre-dating the execution of their contract, Shattuck appears to have recognized the prudence of obtaining such consent, stating he "would like to have a letter from the other two groups . . . indicating that they have no objection to our entering into such an agreement with you."  Smith Decl., Ex. 44 at p. 5. No such consent is reflected in the record, and in fact, the NY Oneidas made known their objection to BSK's representation of the CAN Oneidas in no uncertain terms.  *Id.*, Ex. 54.  Therefore, we find that BSK's representation of the CAN Oneidas was improper under Canon 5 and DR 5-108 of the Model Code.

### 3.  *Effect of BSK's Improper Representation*

The NY and WI Oneidas argue that BSK has forfeited its right to fees because they engaged in "wrongdoing or dereliction" under Paragraph 10 of the original Retainer Agreement, and pursuant to "the generally-applied rule that disloyal attorneys may not receive or keep fees."  Sep. Opp'n at

p. 12.

Paragraph 10 of the Retainer Agreement states, "[i]f the contract shall be so terminated, except for the wrongdoing or dereliction of the attorneys," the court shall assess equitable fees due the attorneys. The "wrongdoing or dereliction" provision is tied to the termination of the contract, which the Court has already determined did not implicate any wrongdoing on the part of BSK. Paragraph 10 is therefore silent on the effect of post-termination ethical violations on attorney's fees.

The NY and WI Oneidas cite to *Silbiger v. Prudence Bonds Corp.* for the proposition that disloyal attorneys forfeit their right to attorney's fees. 180 F.2d 917, 920-21 (2d Cir. 1950). In that case, the Second Circuit stated that "an attorney must not represent opposed interests; and the usual consequence has been that he is debarred from receiving any fee from either, no matter how successful his labors." *Id*. at 920. In this case, BSK did not represent opposing interests in a "suit inter partes." *Id.* at p. 921. At the time BSK signed the contract with the CAN Oneidas, the NY Oneidas were a former client. Moreover, to date, all three tribes maintain a common interest in their joint civil claims against the State in the Reservation Case, which are predicated upon the same factual and legal bases.

Furthermore, the rule announced in *Silbiger* is not without exception. In fact, in that very case, the Second Circuit held that reduced attorney's fees are properly allowed despite an improper representation of opposing interests when "the client is otherwise adequately protected, and the attorney is not paid in any part by the party whose side he has opposed." *Id.* at 920-21. In *New York, N.H. & H.R. Co. v. Iannottii*, the Second Circuit upheld the decision of a bankruptcy court sitting in equity to allow compensation to attorneys who represented conflicting interests. 567 F.2d 166, 179 (2d Cir. 1977). In that case, the Second Circuit affirmed that absent a statutory directive

to the contrary, a court sitting in equity has the discretion to assess an appropriate penalty for an improper representation of conflicting interests and is not "bound by an absolute rule prohibiting compensation in the case of conflict of interest[.]"  *Id.* at p. 179.

BSK's representation of the CAN Oneidas, though improper, did not reduce the value of the services BSK performed on behalf of the Nation prior to the termination of the Retainer Agreement in 1978.  *Id.* at 180-81 (stating that the value of the services performed prior to the conflict of interest was of "crucial significance" in determining the appropriate penalty).  Nor is there any evidence in the record that BSK's improper representation of the CAN Oneidas has prejudiced the NY or the collective Nation's land claims in any way.  As such, to permit the NY Oneidas "to retain the benefit of [BSK's] services without paying for them would amount to a windfall" for the NY Oneidas.  *Id.* at 181; *see also In re Eastern Sugar Antitrust Litig.*, 697 F.2d 524, 533 (3d Cir. 1982) (holding that attorney's fees should not be disgorged when to do so would "[provide] the client with a windfall and deprive[] the attorney of fees earned while acting ethically"); *Louima v. City of New York*, 2004 WL 2359943, at *3 (S.D.N.Y. Oct. 5, 2004) (adopting magistrate judge's recommendation that attorney's fees be reduced, not completely denied, after attorneys violated duty of confidentiality).

Therefore, the Court concludes that BSK's improper representation does not warrant the complete preclusion of attorney's fees due under the terms of the Retainer Agreement.[28]  Rather, a lesser pecuniary penalty is appropriate given the specific circumstances of this case.  The Court recommends that upon arriving at a determination of the amount owed BSK by the NY Oneidas, said amount be **discounted ten percent (10%)** as a penalty for BSK's improper representation.  Because

---

[28] Pursuant to the Retainer Agreement, any fees due BSK for work done in furtherance of the Reservation Case is contingent upon the Nation's recovery.  Retainer Agreement at ¶ 10.

the WI Oneidas' ethical claims related only to BSK's pre-1978 conduct, for which we found no ethical violations, we do not recommend that any fees owed BSK by the WI Oneidas be discounted.

## IV. CALCULATION OF FEES

By its Motion, BSK asks the Court to order that any fees due it be calculated "as a specific percentage of the value of the consideration recovered by, awarded to or otherwise received by the Oneidas, including all benefits and compensation conferred by or on behalf of the State and its political subdivisions, instrumentalities and agencies in the Test and Reservation Cases." BSK's Mem. of Law at p. 25. The NY and WI Oneidas submit that any fee due BSK should be based on an hourly fee rate, because Paragraph 10 "does not refer to a percentage fee," but rather, to "concepts of quantum meruit and equitable share." Joint Opp'n at p. 22.

Paragraph 10 of the Retainer Agreement provides that in the event the contract is prematurely terminated, the "attorneys shall be credited with such share in the attorney fee as the court or tribunal finally determining the Oneidas' claim may determine to be equitable." The Retainer Agreement originally provided for a fixed contingency fee of twenty percent (20%) of any recovery obtained by the Nation below a $1,000,000. Over thirty (30) years have passed since the termination of the Retainer Agreement in 1978. Since BSK's withdrawal, the Nation has pursued its land claims in the Test and Reservation cases zealously, engaging in extensive negotiations and motion practice. In the Test Case, BSK withdrew after helping the Nation establish liability against Oneida and Madison Counties. Thereafter, the Nation's substitute counsel pursued the damages phase of the trial, which included appeals before the Second Circuit, another appearance before the Supreme Court, and several motions before the District Court. *See generally* Test Case Dkt. Damages were finally awarded in that case on May 6, 2003, and their receipt acknowledged on

-54-

March 11, 2004. Test Case Dkt. No. 119 & entries, dated Mar. 9, 2004. In the Reservation Case, BSK's participation as counsel was limited to researching, drafting, and filing the Complaint. Shattuck Decl. at ¶¶ 110-11 (describing BSK's involvement in the Reservation Case); Reply at p. 5.

There are now judgments in both the Test and Reservation cases. In the Test case, based upon an amended judgment and the parties' stipulation, the Honorable Neal P. McCurn issued an order setting the amount of damages against the Counties of Oneida and Madison at $57,494.87, which has been satisfied, Test Case, Dkt. No. 121, Order, dated Mar. 9, 2004, while, in the Reservation case, Judgment has been issued in favor of the Defendants, Reservation Case, Dkt. No. 623, Judgment, dated January 10, 2011. Considering that the Retainer Agreement originally provided for a fixed contingency fee of twenty percent (20%) of any recovery obtained by the Nation below $1,000,000, even factoring in the naught result of the Reservation case, the total attorney's fee would be $11,498.97. However, even though BSK established liability in the Test case, a significant aspect of the litigation continued with the damages phase. In this respect, subsequent counsel, possibly subject to the same Retainer Agreement, at least as it relates to the Test case, would and should be entitled to a reasonable portion of the twenty percent (20%) contingency fee as well.[29] Under these circumstances and pursuant to the Retainer Agreement, all that BSK would qualify for is a credit of such share in the attorney's fees as determined by this Court to be equitable. Realizing that apportionment of the fee, under our facts, defies precise calculation, the principle of equity establishes that BSK should not receive either the entire contingency fee of

---

[29] Attorney Shattuck avers that NARF was retained on a no-fee basis by the Oneidas. Shattuck Decl. at ¶ 135. However, there is nothing in the record that confirms his averment or that NARF accepted a Retainer Agreement similar to BSK's. Nonetheless, no matter how the fee is calculated, BSK is seeking "an equitable share of the 10% fee that the firm would have received, had it not withdrawn." BSK Mem. of Law at p. 16.

twenty percent (20%) or an attorney fee greater than what subsequent counsel would have earned with this recovery.  This Court also acknowledges that there is no bright-line demarcation that this Court may perform or rely upon to determine a true division of time and effort expended to establish either liability and damages, without the parties speculating as to their hourly devotion to each of these phases of this litigation, which commenced nearly four scores ago.  Accordingly, it is recommended that BSK be awarded fifty percent (50%) of the contingency fee, which would amount to ten percent (10%) of the total recovery, discounted ten percent (10%) for its post-1978 conduct.  In sum, the total percent of recovery is nine percent (9%) and the amount that is recommended as attorney fees for BSK is $5,174.54.[30]

## V.  CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that BSK's Motion to have the Court Recognize it's Right to a Fee (Civ. Case No. 70-CV-35 (LEK), Dkt. No. 55; Civ. Case No. 74-CV-187 (LEK/DRH), Dkt. No. 130) be **granted** to the extent outlined above; and it is further

**ORDERED**, that the Clerk of the Court forward this Report-Recommendation and Order to the Honorable Thomas J. McAvoy, Senior United States District Judge, for consideration in accordance with the Orders issued by the Honorable Lawrence E. Kahn, Senior United States District Judge (Civ. Case No. 70-CV-35 (LEK), Dkt. No. 99; Civ. Case No. 74-CV-187

---

[30] BSK makes the specious argument that the Retainer Agreement "does not indicate its terms are limited to any monetary recovery by the Oneidas[.]"  BSK Mem. of Law at p. 13.  Under BSK's interpretation of the Retainer Agreement, the Oneidas recovery "means the value of all benefits and compensation conferred by or on behalf of the State, through a judgment . . . which may include rights in real property; . . . tax relief [] the establishment of economic empowerment zones . . . [and] a wide array of benefits and compensation[.]" *Id*. at pp. 13-14.  The Court cannot imagine what all of this would portend in terms of a fee.  Yet, the Retainer Agreement neither explicitly or implicitly embraces that interpretation.  The Retainer Agreement clearly states that attorneys fees are based upon the amount recovered.  Nonetheless, there is nothing in the record that there is a recovery other than monetary damages.

(LEK/DRH), Dkt. No. 463); and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), & 6(e).

Date:   February 18, 2011
        Albany, New York

RANDOLPH F. TREECE
United States Magistrate Judge